Revised May 16, 2001

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 00-20041
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS


GEORGE L.J. WILSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

April 19, 2001

Before REYNALDO G. GARZA, DAVIS, JONES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

George Wilson was indicted on multiple charges of conspiracy to commit money laundering, money laundering, mail fraud, and engaging in monetary transactions involving property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1341, and 1957(a). Wilson was tried by a jury and convicted on eighteen of nineteen counts. He now appeals these convictions. For the reasons that follow, we REMAND for a hearing on Wilson's motion to dismiss and otherwise AFFIRM, subject to the district court's ruling on that motion.

George Wilson was a prominent businessman in Nassau, Bahamas. In 1986, he became involved with the Winston Hill Assurance Company, which at that time provided bonding services. Wilson's relationship with Winston Hill began in 1986 when American businessman and former Texas state senator James Day approached Wilson. Day proposed that he procure the necessary approvals and business for Winston Hill to expand into the casualty insurance business if Wilson would provide the financial support to underwrite that business. Wilson agreed, and the company began selling insurance through brokers.

Wilson was the president of Winston Hill, and operated out of Winston Hill's home office in Nassau. Winston Hill's Nassau staff also included a secretary, an office manager, a receptionist, a typist, and the firm's accountant, Norwood Rolle. The Nassau office was an old, small, unkempt, two-story house. Winston Hill's other office was located in Houston, Texas. Steve Udell, James Day, Dion Burkard, and John Adair were all employees of the Houston office. Udell (a lawyer) and Day headed up the Houston office, Burkard was the office manager and later became a junior underwriter, and Adair was the accountant.

In August 1996, Winston Hill was reportedly capitalized with $5,000,000. Winston Hill issued financial statements to brokers reporting the following total assets: over $63,000,000 on December 31, 1988, over $65,000,000 on March 31, 1989, almost $67,000,000 on September 30, 1989, and over $70,000,000 on December 31, 1989. The

financial statement reporting over $63,000,000 in total assets as of December 31, 1988 was audited by Norwood Rolle.

Winston Hill reported that a large portion of the company's assets were held in Gulf Union Bank in Nassau, Bahamas. Insurance brokers and insurance regulators uniformly testified that Wilson and other employees of Winston Hill denied them access to the records to substantiate these assets. Wilson and Udell assured brokers that the assets were in Gulf Union Bank, but they were unwilling to provide any proof other than the financial statements.

By June of 1990, Winston Hill was placed on the California Department of Insurance's (CDOI) "watch list." CDOI places a company on this list after it receives a number of complaints of a company's tardy payment of claims. A letter sent by the CDOI on March 20, 1991 triggered a regulatory bulletin directing its insurance broker members not to do business with Winston Hill.

By December 1991, Winston Hill had filed for bankruptcy in the Turks and Caicos Islands - the site of incorporation. Norwood Rolle, Winston Hill's accountant, was appointed as liquidator to wind up the company. Rolle went to Houston and filed an ancillary proceeding in the Bankruptcy Court for the Southern District of Texas. That court appointed Steve Smith to serve as the co-fiduciary of this proceeding. Because Rolle had been actively involved in Winston Hill's business, Smith had Rolle removed as the company's liquidator, and took over that position himself. Smith determined that most of Winston Hill's assets were located in the Gulf Union Bank in Nassau.

3

Smith received records of Winston Hill's account at Gulf Union Bank. These records showed the following balances: $174 on April 30, 1988; $11,749 on December 31, 1988; $155 on March 31, 1989; $8,637 on June 30, 1989; $26 on September 30, 1989; $11,187 on December 31, 1989; and negative $51,390 on December 31, 1990. Smith was unable to locate any other significant assets of Winston Hill.

Wilson was indicted on nineteen counts, and was convicted on counts one through eighteen. The Government's case revolved around Wilson's alleged false statements (primarily about the financial condition of Winston Hill) designed to attract insurance premiums to the company, along with related money laundering and other illegal monetary transactions. He now appeals this eighteen-count conviction on a number of grounds which we consider below.

II.

Wilson makes several arguments regarding the application of the statute of limitations in his case which we consider below.

A.

First, he contends that the district court erred in granting the Government's application to toll the statute of limitations in this case, and later, in failing to dismiss the entire indictment because the statute of limitations had expired.

The latest offense date alleged in the indictment was June 26, 1991. The indictment in this case was not returned until October 26, 1998. Wilson therefore contends that the indictment is untimely because it was returned outside of the five-year statute

4

of limitations provided by 18 U.S.C. § 3282.[1]  The Government argues that the indictment here was returned timely because the district court granted its application for a suspension of the statute of limitations under 18 U.S.C. § 3292 on December 21, 1994. Section 3292 provides, in pertinent part, as follows:

> (a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence....

1.

Wilson first maintains that the district court erred in tolling the statute of limitations under 18 U.S.C. § 3292 in its December 21, 1994 Order.  We review the factual findings underlying the district court's decision to toll the statute of limitations for clear error.  <u>United States v. Meador</u>, 138 F.3d 986, 991 (5th Cir. 1998).  An application to toll the statute of limitations under § 3292 is a preindictment, ex parte proceeding.  Thus, the only evidence the district court had before it was the evidence presented by the United States.

In its application for tolling, the United States presented the district court with a copy of a letter addressed to the Attorney General of the Bahamas and signed by the Director of the

---

[1]18 U.S.C. § 3282 provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."

Criminal Division of the Department of Justice's Office of International Affairs. This letter requested "authenticated copies of the records of all accounts at the Gulf Union Bank of Nassau under the names of Winston Hill, George Wilson, and Management International" and "authenticated copies of all records of the Registrar General's Office...relating to the Winston Hill Assurance Company." R. at 1-304-10.[2] The United States represented to the court that this letter was delivered to the Bahamian government on or about November 24, 1993. The words "VIA FEDERAL EXPRESS" were typewritten at the top of the letter. Based on this evidence, the district court made the finding required by § 3292: the United States made an official request to the Bahamian government for evidence located in the Bahamas. In light of the evidence the Government presented, the district court did not clearly err in finding that the United States made this request for evidence and correctly tolled the statute of limitations.

2.

Wilson next challenges the district court's July 13, 1999 Order denying his motion to dismiss the indictment as untimely, as well as his request for a hearing on this motion. In his bare bones motion to dismiss, Wilson asserted that the applicable statute of limitations for all counts of the indictment was five

---

[2]The request was made "pursuant to the Treaty between the United States and the Commonwealth of The Bahamas on Mutual Assistance in Criminal Matters, signed at Nassau June 12 and August 18, 1987" and thus meets 18 U.S.C. § 3292's requirement that the "official request" be "a request under a treaty or convention." R. at 1-310.

6

years, and that the five-year period expired before the indictment was returned. Wilson did not address in his motion the fact that the district court had tolled the statute.

The Government responded to Wilson's motion to dismiss by stating that a formal legal assistance request had been made of the Bahamian government, and that the statute of limitations had been tolled under 18 U.S.C. § 3292. It attached the Department of Justice's November 24, 1993 letter, described above, its application for tolling filed on December 12, 1994, and the district court's December 21, 1994 Order tolling the statute of limitations. The district court denied Wilson's motion because the statute of limitations had been tolled by its December 21, 1994 Order. The court found that the "official request" required under § 3292 was made on November 24, 1993 and that the statute of limitations was therefore suspended from that day until November 23, 1996. The court then determined that the filing of the indictment on October 26, 1998 was timely, given the above suspension period.

We review the district court's denial of a motion to dismiss de novo. Yates v. Stalder, 217 F.3d 332, 334 (5th Cir. 2000). Wilson did not assert in his motion to dismiss or elsewhere that the Government did not make a formal legal assistance request of the Bahamian government, nor did he argue that the statute of limitations was improperly tolled. The Government produced ample evidence to show that the statute of limitations was extended as a result of tolling under § 3292, and that the indictment was

7

therefore returned in a timely manner.  The district court did not err in denying Wilson's motion to dismiss.  Moreover, because Wilson's motion to dismiss did not raise a factual issue, the district court did not err in denying his request for a hearing. See n.3, infra.

3.

Wilson next argues that the district court erred in its August 4, 1999 Order denying his motion for reconsideration of his earlier motion to dismiss.  In his motion for reconsideration, Wilson, for the first time, challenged the Government's assertion that it sent the letter to the Bahamian government requesting assistance. Wilson presented evidence to support this contention.  He pointed out that this letter differed from another letter sent by the OIA to the Bahamas on December 3, 1993, because it did not contain a letterhead address, case number, or identification number.  Also, Wilson pointed out that the United States did not produce the Federal Express air bill for the letter, nor did it produce the Federal Express bill for letters sent during November of 1993 to support its contention that it sent the letter via Federal Express.

Wilson also argued that the government log of the OIA's Correspondence Unit indicates that the letter was not sent.  This log has no entry reflecting that a letter was sent to the Bahamas in November of 1993.  In addition, Wilson produced statements of Bahamian officials, as well as records of the Supreme Court of the Bahamas, asserting that the Bahamian government never received the letter.

8

In opposition to Wilson's assertion that the letter was not sent, the district court had before it the evidence presented by the United States in the Government's Response to Motion to Dismiss Indictment. As mentioned above, this consisted of a formal legal assistance request letter dated November 24, 1993 that contained the words "VIA FEDERAL EXPRESS," and the United States' representation that it was sent to the Bahamian government.

The district court has considerable discretion whether to consider evidence on a motion for rehearing, particularly where that evidence was available and could have been presented in the initial hearing. Here, the district court's August 4, 1999 Order denying Wilson's motion for reconsideration and request for a hearing does not explicitly state whether the court considered the evidence presented by Wilson to support his contention that the letter was not sent. Because the order states that the motion for reconsideration and request for a hearing were denied after "[h]aving considered the motion, submissions, and applicable law," we read the order as though the district court did consider Wilson's evidence. District Court's Order of August 4, 1999. R. at 2-332. This view is reinforced by the fact that the Government does not argue that the district court did not consider Wilson's evidence or that it was appropriate for it to decline to consider his evidence. Because the evidence raises a factual issue as to whether the letter was sent, the district court erred in denying

9

Wilson's request for a hearing on his motion for reconsideration.[3] We therefore vacate the district court's order denying Wilson's motion to dismiss without a hearing and remand for the district court to conduct a hearing on the factual issue of whether or not the letter was sent.

B.

Wilson next argues that the district court erred in not submitting the issue of tolling under 18 U.S.C. § 3292 to the jury. Relatedly, he contends that the district court abused its discretion in rejecting his requested jury instruction. Wilson's requested jury instruction stated, in pertinent part, that "[i]n order to find that the statute of limitations was properly suspended, the Government must establish beyond a reasonable doubt all of the following:  ...[t]he central authority of the United States properly requested the evidence from the central authority of the Bahamas on November 24, 1993...." Special Requested Jury Instruction No. 25, R. at 3-605.  In other words, Wilson asked for an instruction that would have required the jury to determine beyond a reasonable doubt that the United States sent the formal legal assistance request letter to the Bahamian government.

Wilson proceeds from two generally accepted premises: 1) that "commission of the crime within the limitations period of [18

---

[3]See 3 Charles Alan Wright, FEDERAL PRACTICE AND PROCEDURE § 675 (2d ed. 1982)("An evidentiary hearing need not be set as a matter of course, but only if the motion alleges facts that, if proved, would require the grant of relief.  Factual allegations that are general and conclusory or based upon suspicion and conjecture will not suffice.")(citations omitted).

10

U.S.C.] § 3282 is an essential element of the offense which the government must prove beyond a reasonable doubt," United States v. York, 888 F.2d 1050, 1057 n.10 (5th Cir. 1989)(citations omitted); and 2) that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." United States v. Gaudin, 515 U.S. 506, 522-23, 115 S.Ct. 2310, 2320 (1995). From this, Wilson argues that in this case the question of whether the statute of limitations was properly tolled must be found by a jury beyond a reasonable doubt. "We review the refusal to give a requested jury instruction for abuse of discretion...." United States v. Barnett, 197 F.3d 138, 142 (5th Cir. 1999).

Section 3292 governs tolling of the statute of limitations based on a request for evidence made by the United States to a foreign country. This section provides, in pertinent part, that "the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence...." 18 U.S.C. § 3292(a)(1)(emphasis added).

Thus, contrary to Wilson's argument, the plain language of the statute requires the district court to decide by a preponderance of the evidence whether the statute of limitations shall be tolled. And we have no doubt that Congress has the authority to extend or retract the statute of limitations. "[T]he history of pleas of limitation shows them to be good only by legislative grace and to

11

be subject to a relatively large degree of legislative control." Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142 (1945). The "shelter of statutes of limitations 'has never been regarded as what is now called a 'fundamental' right,' but is instead 'good only by legislative grace and...subject to a relatively large degree of legislative control.'" Gray v. First Winthrop Corp., 989 F.2d 1564, 1573 (5ᵗʰ Cir. 1993)(quoting Chase, 325 U.S. at 314). Because Congress assigned to the court the authority to decide whether the limitations period should be extended, the district court did not err in deciding this issue and in declining to submit it to the jury.

Once the district court tolls the statute of limitations, this becomes the applicable limitations period. The United States must then prove beyond a reasonable doubt that the indictment was brought within this extended period, which begins when the defendant commits his last criminal act. The applicable statute of limitations period in this case is therefore eight years.[4] Wilson concedes that the indictment was returned within this eight-year period. Therefore, his constitutional right to have all elements of his crime proved beyond a reasonable doubt was not violated.

---

[4]The five-year statute of limitations provided by 18 U.S.C. § 3282 can be tolled up to three years by 18 U.S.C. § 3292. The statute of limitations is tolled from the date the official request is made until "final action" is taken upon this request by the foreign government. 18 U.S.C. § 3292(b). See also United States v. Meador, 138 F.3d 986, 987 (5ᵗʰ Cir. 1998). This tolling cannot exceed three years. 18 U.S.C. § 3292(c)(1). Because final action was never taken by the Bahamian government, the statute of limitations was tolled for three years.

C.

Wilson argues, finally, that in no event was the Government's request to Bahamian authorities for evidence sufficiently specific to toll the limitations period for the offense charged under 18 U.S.C. § 1957 - engaging in monetary transactions involving property derived from specified unlawful activity. The Government's official request, attached to its November 24, 1993 letter to the Bahamian government, stated that the U.S. government was investigating offenses of "mail fraud, embezzlement, and money-laundering." The letter further noted possible violations of 18 U.S.C. §§ 1341, 1952, 664, 1956(a)(1), and 1956(a)(2). Wilson argues that this request was not sufficient to toll the statute of limitations with regard to 18 U.S.C. § 1957, because that statute was not specifically enumerated in the letter.

We agree with the Government that "it would be unreasonably formalistic as well as unnecessary to impose a requirement that the Government list by citation the statutes that may have been violated...." United States v. Neill, 952 F.Supp. 831, 833 (D. D.C. 1996). The request for evidence must only be "reasonably specific in order to elicit evidence of the alleged violations under investigation by the grand jury." Id. This circuit has referred to a violation of 18 U.S.C. § 1957 as "money laundering." It is clear to us that the Government's use of the phrase "money laundering" in its request for assistance was "reasonably specific," and adequate to toll limitations for this offense. See e.g., United States v. Davis, 226 F.3d 346, 355 (5th Cir. 2000).

13

III.

Wilson next argues that the district court improperly admitted Bahamian bank records under Fed. R. Evid. 807, the residual hearsay exception.[5] We review evidentiary rulings of the district court for abuse of discretion. United States v. Phillips, 219 F.3d 404, 409 (5th Cir. 2000).

The Government obtained the bank records from Steve Smith, the trustee of the ancillary Winston Hill bankruptcy action. In 1994, Smith began his efforts to identify and liquidate all of the assets of Winston Hill. Through his Bahamian counsel, Smith asked Gulf

─────────────

[5]Fed. R. Evid. 807 provides as follows:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be best served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The Government conceded that the bank records here were not admissible under Fed. R. Evid. 803(6) (the business records exception) because there was no custodian available to testify.

Despite the "statement not specifically covered by rule 803" language in Fed. R. Evid. 807, 807 "is not limited in availability as to types of evidence not addressed in other exceptions...[807] is also available when the proponent fails to meet the standards set forth in the other exceptions." United States v. Furst, 886 F.2d 558, 573 (3rd Cir. 1989).

14

Union Bank to produce the records of "any and all accounts" of Winston Hill from 1988 forward.  Smith then received the records from his Bahamian counsel, who obtained the records from Gulf Union's lawyers.  Smith testified that he relied on the Gulf Union records to identify and liquidate Winston Hill's assets.

Wilson argues that the documents do not meet the "particularized guarantees of trustworthiness" required by the Confrontation Clause.[6]  First, he argues that the records were for one account only (#010201000051), and Wilson raised questions at trial as to whether additional accounts existed.  Although Wilson questioned whether additional accounts may have existed during cross-examination of witnesses, the record is otherwise silent on any other Winston Hill accounts with Gulf Union Bank.

Second, Wilson argued that Gulf Union bank records were not produced for some time periods.  For example, the records Steve Smith received do not cover December 31, 1989 to December 30, 1990.  The fact that no records were found for certain months, however, does not detract from the reliability of those that were produced.

Third, Smith testified that he suspected that some of the posting dates on the records were inaccurate, *i.e.*, he surmised that some of the dates were a result of either typographical errors or post-dating.  To illustrate this point, Smith referenced several transactions occurring in the months of January and March of 1991 showing posting dates of 1995, while most transactions occurring in

---

[6]<u>United States v. Ismoila</u>, 100 F.3d 380, 393 (5th Cir. 1996).

15

February of 1991 show 1991 posting dates. Wilson argues that these date inconsistencies undermine the reliability of the records. However, the running balance given after each transaction supports the inference that the 1995 posting dates were merely the result of clerical error.

Fourth, Smith did not receive the records from the bank directly, but rather, from his lawyers in the Bahamas, who received the records from the bank's lawyers. This indirect chain of custody from the bank to the court is an issue that may detract from the reliability of the records and is a factor for the district court to consider in assessing reliability, but is not fatal to the records' admissibility.

Although Wilson's arguments that these Bahamian bank records are unreliable are not insubstantial, we are not persuaded that the district court abused its discretion in reaching a contrary conclusion and admitting the records. The Government identified several wire transfers into Winston Hill's Gulf Union bank account #000051 which it was able to trace from known transmittals from International Reinsurance Consultants, Inc. (IRCI), Winston Hill's reinsurance company. IRCI made each of these wire transfers to Winston Hill's Chase Manhattan bank account in New York, and from there to Winston Hill's Gulf Union account in Nassau (#010201000051). This is the same Winston Hill account in Gulf Union Bank that Steve Smith located and relied upon.

Other circuits have held that "bank documents, like other business records, provide circumstantial guarantees of

16

trustworthiness because the banks and their customers rely on their accuracy in the course of business." United States v. Pelullo, 964 F.2d 193, 202 (3rd Cir. 1992). This same rationale has been extended to foreign bank records. See, e.g., Karme v. Commissioner of Internal Revenue, 673 F.2d 1062, 1064 (9th Cir. 1982) (discussing records of a Netherlands Antilles bank). The district court did not abuse its discretion in concluding that the Bahamian records here possess the necessary guarantees of trustworthiness.

We agree with the Government that Wilson's concerns, noted above, go to the weight of the evidence, not its admissibility. The possibility that the records were incomplete or inaccurate was argued to the jury, and the jury was entitled to determine the appropriate weight to be given to the records in light of those concerns.

IV.

Wilson next challenges the sufficiency of the evidence on all eighteen counts of his conviction. In reviewing the sufficiency of the evidence, we "view the evidence in the light most favorable to the verdict and uphold the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt." United States v. Brown, 186 F.3d 661, 664 (5th Cir. 1999).

A.

In counts two through nine, Wilson was convicted of committing mail fraud in violation of 18 U.S.C. § 1341. These counts are based on eight premium checks that Frank Raab, an insurance broker,

17

mailed to Winston Hill between November of 1990 and March of 1991. The Government proceeded on a theory that Wilson induced Frank Raab to send these checks by authorizing the preparation and dissemination of the December 31, 1989 financial statement that Wilson knew grossly overreported the amount of assets controlled by Winston Hill. This statement reported that Winston Hill had over $70,000,000 in assets, including over $67,000,000 in cash or cash equivalents.

The two basic elements of 18 U.S.C. § 1341 are 1) participation in a scheme to defraud, and 2) causing a mailing for the purpose of executing the scheme.[7] <u>United States v. Fox</u>, 69 F.3d 15, 17 (5th Cir. 1995). Wilson challenges the sufficiency of the evidence as to both elements. Wilson first argues that the Government's evidence is insufficient as to element one because it failed to offer sufficient evidence to prove that the financial statement was false.

In his January 1993 interview with Marcy Kurtz (lead counsel for Winston Hill during part of its liquidation), Wilson admitted that Winston Hill "never really had this money [that was reported on Winston Hill's financial statements as an asset] in Winston Hill's accounts." R. at 20-177. The records from Gulf Union Bank in Nassau indicate that the balance in Winston Hill's account was

_____

[7]Section 1341 provides, in pertinent part, that "[w]hoever, having devised or intending to devise any scheme...for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...for the purpose of executing such scheme...causes to be delivered by mail or such [private or commercial interstate] carrier...."

18

only $11,187 on December 29, 1989. Witnesses uniformly testified that the spartan house and staff that constituted Winston Hill's home office in Nassau was inconsistent with a company boasting over $50,000,000 in assets. This evidence is sufficient to prove that the financial statement was false.

Wilson next argues that proof of the first element is lacking because the Government offered insufficient evidence to prove that Wilson knew that the financial statement was false when it was made. The Government presented testimony from Dion Burkard, who started working for Winston Hill's Houston office in 1988. In October 1989, Burkard told Wilson that the Houston office did not have enough money to pay claims being made by policyholders and asked Wilson to deposit money into these accounts. Wilson declined this request and informed Burkard that all claims were to be processed through the Nassau office.

The fact that Winston Hill's Gulf Union Bank account had a balance of only $11,187 just two days before the statement was issued also supports the jury's conclusion. The jury was entitled to infer that Wilson, Winston Hill's president, might misapprehend within a few thousand dollars the amount of money his company had in the bank; but that it was inconceivable that he would think his company had millions of dollars in the bank when it had just $11,187. Also, Wilson knew that Rolle, who provided the audited statement of Winston Hill's financial condition, was on Winston Hill's payroll and not an independent auditor. This evidence is sufficient for the jury to infer that Wilson knew the financial

19

statement was false when it was made.

Wilson also argues that the Government offered insufficient evidence to prove the second element of 18 U.S.C. § 1341 - that Wilson caused a mailing for the purpose of executing the fraudulent scheme. As discussed above, however, the Government offered sufficient evidence for the jury to find that the financial statements Wilson authorized for release were false and that this induced brokers and policyholders to mail premium checks. Thus, the evidence was sufficient for the jury to convict Wilson on counts two through nine.

B.

In counts ten through twelve, Wilson was convicted of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), based on three checks totaling $38,005 that Wilson mailed to Udell from October of 1990 to March of 1991. To establish this offense, § 1956(a)(1)(A)(i) requires that the Government prove beyond a reasonable doubt that: 1) the financial transaction involved the proceeds of unlawful activity (mail fraud or wire fraud in this case); 2) the defendant knew that the property involved in the financial transaction represented proceeds of an unlawful activity; and 3) the financial transaction was conducted with the intent to promote the carrying on of specified unlawful activity.

As discussed above, the Government established that the evidence was sufficient to support the mail fraud counts, and that establishes the first element of this offense. Also, as discussed above, the Government presented sufficient evidence to prove

20

element two - that Wilson knew that the money in the bank account on which the check was drawn represented proceeds of mail or wire fraud.

The third element of § 1956(a)(1)(A)(i) requires that the Government prove that Wilson wrote the checks to Udell with the intent to promote specified unlawful activity. Wilson argues that the Government's evidence is insufficient on this element because it allegedly failed to show the purpose of the checks. Wilson asserts that the Government has offered no evidence to show that these payments to Udell were anything other than legitimate business expenditures.

In support of this assertion, Wilson cites a case in which this court reversed money laundering convictions based on a car dealership's expenditures on various items used to conduct its legitimate business, such as office supplies, cars, and advertising. United States v. Brown, 186 F.3d 661 (5th Cir. 1999). Brown, however, is readily distinguishable.

In Brown, the payments were to legitimate businesses for legitimate business expenditures. In our case, the Government produced sufficient evidence for the jury to conclude that Udell, the recipient of these payments, was an unindicted coconspirator. The Government introduced testimony that Udell stalled claimants and also channeled them to the Nassau office per Wilson's instructions. In fact, much of Wilson's defense consists of blaming Udell and Day for perpetrating the scheme, and asserting that he was naive and ignorant of the scheme. Also, Wilson

21

concedes that the payments at issue did not represent Udell's salary of $5000 a month. Thus, the Government introduced sufficient evidence to allow the jury to infer that Wilson's payments to Udell were designed to compensate one of his coconspirators so he would continue to assist in carrying out the conspiracy of bilking policy holders and claimants.

The payments at issue in our case are more analogous to those made in United States v. Coscarelli, 105 F.3d 984 (5th Cir. 1997), vacated, 111 F.3d 376 (5th Cir. 1997), reinstated, 149 F.3d 342 (5th Cir. 1998), and United States v. Leonard, 61 F.3d 1181 (5th Cir. 1995). Both of these cases involved a fraudulent telemarketing scheme. In Coscarelli, we stated that:

> Coscarelli then collected the proceeds of this fraudulent scheme and paid the coconspirators, the telemarketers, and general operating expenses of the scheme.... [Thus] Coscarelli knowingly conducted financial transactions using the proceeds of this unlawful telemarketing scheme with intent to promote or carry on the unlawful activity of the scheme in direct violation of 18 U.S.C. § 1956(a)(1)(A)(i).

105 F.3d at 990.

Similarly, in Leonard, we stated that:

> Greene's money laundering activity, regardless of its limited extent, advanced the mail and wire fraud scheme that victimized nearly 500 people.... By conducting financial transactions-paying [coconspirator] callers, purchasing leads, paying phone bills-with the victims' money for the purpose of bilking more people out of $395.50 each, the group of targeted victims became the victim of the money laundering activity as well as the fraud scheme.

61 F.3d at 1186.

The jury was entitled to conclude that Wilson made these

22

payments to a coconspirator to continue the fraudulent scheme. The jury's conclusion that Wilson paid Udell with the intent to promote the fraudulent scheme involving mail and wire fraud was sufficiently supported by the evidence.

C.

In counts thirteen through eighteen, Wilson was convicted of engaging in monetary transactions with criminally derived property in violation of 18 U.S.C. § 1957(a). Counts thirteen through eighteen were based on $875,000 that Wilson withdrew, using six checks, from Winston Hill's account at First City Bank of Houston. Section 1957(a) requires the Government to prove that: 1) property valued at more than $10,000 was derived from specified unlawful activity (here, mail or wire fraud); 2) Wilson engaged in a monetary transaction with this property; and 3) Wilson knew that this property was derived from unlawful activity. Wilson argues that the Government has offered insufficient evidence on the first and third elements.

Specifically, Wilson argues that the Government has offered insufficient evidence to show that there was a fraudulent scheme. In the alternative, he argues that if there was sufficient evidence to demonstrate the existence of a fraudulent scheme, he was not aware of the scheme. We rejected these arguments in the discussion above. Thus, there was sufficient evidence to support the jury's verdict on counts thirteen through eighteen.

D.

In count one, Wilson was convicted under 18 U.S.C. § 1956(h)

23

of conspiring to launder money with Rolle and two others. The Government is required to prove beyond a reasonable doubt that: 1) there was an agreement between two or more persons to launder money; 2) the defendant voluntarily agreed to join the conspiracy; and 3) one of the persons committed an overt act in furtherance of the conspiracy. United States v. Pettigrew, 77 F.3d 1500, 1519 (5th Cir. 1996). Wilson challenges the sufficiency of the evidence on the first and second elements. As discussed above, the evidence supported the jury's verdict that Wilson laundered money by sending three checks to Udell, which Udell accepted. Thus, the jury was entitled to infer that there was an agreement between Wilson and Udell to launder money. Therefore, the evidence is sufficient to support the jury's verdict as to count one.

V.

Wilson next argues several points of error with regard to his sentencing. First, Wilson argues that the district court misapplied the sentencing guidelines in applying the more severe money laundering guidelines rather than the fraud guidelines. Wilson contends that the sentencing guidelines on money laundering (United States Sentencing Guidelines § 2S1.1, et seq.) were intended by the Sentencing Commission to be applied to individuals involved in drug offenses and organized crime. Because Wilson was not engaged in either of these activities, he argues that the district court should have applied the fraud guidelines. This contention is clearly without merit. This court has upheld the application of the money laundering guidelines in cases not

24

involving drugs or organized crime. See, e.g., United States v. Powers, 168 F.3d 741, 753 (5th Cir. 1999).

Second, Wilson argues that the district court erred in refusing to grant a downward departure on the basis that Wilson's offenses fell outside of the "heartland of the [money laundering] guidelines" since they involved neither drug trafficking nor organized crime. Similarly, Wilson argues that the district court erred in refusing to grant a downward departure based on his status as a deportable alien. In essence, Wilson argues that his status as a deportable alien will lengthen his ultimate period of confinement because he is ineligible for community based programs administered by the Bureau of Prisons, he is ineligible for assignment to a minimum security federal correctional camp, and he is subject to an additional period of confinement after completing his sentence while awaiting actual deportation.

The failure of the district court to grant such discretionary departures, however, is not subject to appellate review. Powers, 168 F.3d at 753. Indeed, this court has explained that "a court's refusal to grant a downward departure from the Guidelines may only be reviewed if the refusal was based on a violation of the law." Id. Such a violation occurs only when the district court's "refusal to depart downward is premised upon the court's mistaken conclusion that the Guidelines do not permit such a departure." Id. See also, United States v. Palmer, 122 F.3d 215, 222 (5th Cir. 1997). Because we have no basis to conclude that Judge Hittner erroneously believed he lacked the authority under the Guidelines

25

to downwardly depart in this case, his refusal to do so is not reviewable on appeal.

Third, Wilson argues that his sentence is in violation of the United States Supreme Court's recent decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 2362-63 (2000) (holding that "any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt"). Relying on the PSR, the district court applied a ten-level enhancement to Wilson's base level of twenty-three on the money laundering charge. This enhancement was based on a finding by the district court that Wilson's money laundering scheme involved $34,000,000. Wilson now argues that <u>Apprendi</u> requires that the jury find that figure beyond a reasonable doubt. This contention lacks merit. It is clear in this circuit that where an enhancement does not increase the defendant's sentence above the statutory maximum, there is no <u>Apprendi</u> violation. <u>See, e.g.</u>, <u>United States v. Meshack</u>, 225 F.3d 556, 576 (5th Cir. 2000); <u>United States v. Doggett</u>, 230 F.3d 160, 166 (5th Cir. 2000). Wilson received a sentence of 240 months, the statutory maximum.[8] Because the statutory maximum has not been exceeded, <u>Apprendi</u> is not implicated.

## VI.

For the reasons stated above, the judgment and sentence of the district court is AFFIRMED in all respects, unless the district

---

[8]Wilson concedes as much in his <u>Brief for the Defendant-Appellant</u> at 61.

26

court grants Wilson's motion to dismiss following a hearing.  In that event, the district court should vacate the conviction on all counts.  If either party is aggrieved by the district court's ruling on the motion to dismiss and files a notice of appeal to this court, this panel will consider any appeals from that ruling.