PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1420
_____

UNITED STATES OF AMERICA

v.

DONALD TURNER, a/k/a Don L. Wood

Donald Turner,

Appellant.

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 1-01-cr-00006-003)
District Judge: Honorable Maurice B. Cohill

Argued January 8, 2013

Before:  RENDELL, FISHER and JORDAN, Circuit
Judges

(Opinion Filed: May 01, 2013)

Lisa B. Freeland, Esq.
Elisa A. Long, Esq.     [ARGUED]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA  15222

Thomas W. Patton, Esq.
Office of Federal Public Defender
1001 State Street
1111Renaissance Centre
Erie, PA  16501
  Counsel for Appellant

Katie Bagley, Esq.
Frank P. Cihlar, Esq.
Gregory V. Davis, Esq.     [ARGUED]
United States Department of Justice
Tax Division
950 Box 502
Washington, DC  20044

Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA  15219
  Counsel for Appellee

_____

OPINION OF THE COURT

_____

**RENDELL**, Circuit Judge.

Donald Turner, *a.k.a.* Don Wood, was convicted by a jury of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The District Court sentenced Turner to 60 months' imprisonment and three years of supervised release. In addition, it ordered Turner to pay $408,043 in restitution to the Government under 18 U.S.C. § 3663. Turner appeals his conviction and sentence. He asserts that the District Court erred in admitting (1) recorded conversations between his co-conspirator and an undercover Internal Revenue Service ("IRS") agent and (2) foreign bank documents that the IRS seized from his co-conspirator's residence and office. Turner also argues that the District Court erred in requiring him to pay $408,043 in restitution because it did not make findings regarding his ability to pay. For the reasons discussed below, we will affirm.

I.

*A. Factual Background*

Turner is the author of *Tax Free! How the Super Rich Do It!*—a book that instructed readers how to "escape federal and state income taxation" through the use of common law trust organizations ("colatos"). (App. 384.)

3

He is also the former director of First American Research ("FAR"), a membership organization that he created to assist members in implementing the colato program described in his book.

In 1991, Turner enlisted Daniel Leveto, the owner of a veterinary clinic, as a new FAR member, and Turner then assisted Leveto in implementing the colato program. FAR created Center Company, a foreign colato, and appointed Leveto as the general manager and Turner as a consultant. Leveto then "sold" his clinic to Center Company, which in turn "hired" Leveto as the clinic's manager.

After the sale, Leveto continued to control and operate the clinic just as he did when he was the owner. But because the clinic was no longer in his name, Leveto stopped reporting the clinic's income on his individual tax returns, and consequently paid no taxes on the clinic. Center Company, which was now responsible for reporting the clinic's income, also did not pay the clinic's taxes because it distributed the clinic's income to other foreign colatos, which according to Turner, "transformed" it to untaxable foreign source income. Thus, no one paid the clinic's taxes.

Although the clinic's taxes went unpaid, Leveto had full access to the clinic's income through various sources, including foreign and domestic bank accounts, nominee foreign and domestic bank accounts, commodity accounts, loans from the colatos, and debit and credit cards opened under the colatos' names.

4

In 1993, Leveto and Turner executed a written agreement for Leveto to market and sell *Tax Free!*. Leveto purchased each book from Turner for $637.50 and agreed to sell the books for at least $1,275 each. In 1995, the IRS began a criminal investigation into Leveto to determine whether Leveto's sale of his veterinary clinic was legitimate, and whether the colato program was valid. As part of the investigation, Manuel Gonzalez, an undercover IRS agent, purchased *Tax Free!* from Leveto. After Gonzalez purchased the book, he and Leveto spoke about the program several times both in person and on the phone. Leveto informed Gonzalez about the benefits of the colato program and encouraged him to attend a FAR membership meeting to better understand how the program worked. Several of these conversations were recorded and introduced as evidence at Turner's trial.

In addition, Leveto submitted Gonzalez's name to Turner as a qualified FAR member, who, in response, sent Gonzalez a letter explaining the benefits of FAR and enclosing a membership application. Turner also spoke with Gonzalez on the phone about the colato program and FAR membership.

The investigation into Leveto's dealings with Turner also involved the search of Leveto's residence and office. IRS agents seized a large volume of documents and records from both locations, including from safes inside Leveto's office. The documents included Leveto's foreign and domestic bank records, his handwritten notes that referenced FAR, colatos, and *Tax Free!*, correspondence with Turner, evidence relating to Leveto's nominee accounts, and correspondence with banks, including wire

transfer requests. Many of these documents were introduced at Turner's trial.

*B. Procedural History*

In 2001, a federal grand jury charged Turner, Leveto, and Leveto's wife, Margaret Leveto, with conspiracy to defraud the IRS by concealing the Levetos' assets, and thus, preventing the IRS from computing and collecting the Levetos' federal income taxes in violation of 18 U.S.C. § 371. Before trial, Turner filed a motion *in limine* to exclude several pieces of evidence, including (1) the recorded conversations between Leveto and Gonzalez, and (2) the foreign bank records that the IRS seized from Leveto's office and residence. Turner argued that both were inadmissible hearsay and that the Government failed to properly authenticate the foreign bank documents. The District Court disagreed and held them to be admissible.

The District Court admitted the recorded conversations under Federal Rule of Evidence 801(d)(2)(E), which states that a statement is not hearsay if it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy." It concluded that there was an unindicted conspiracy between Leveto and Turner to impede or impair the IRS's tax collection efforts by recruiting members to FAR, which worked with members in concealing their income from the IRS, and that Leveto's statements to Gonzalez furthered that conspiracy.[1] The District Court

---

[1]We note for context that in its response to Turner's motion *in limine*, the Government argued that the recorded

held that the Government properly authenticated the foreign bank documents and admitted documents bearing Leveto's signature or handwriting under Federal Rule of Evidence 801(d)(2)(E). It admitted the rest of the contested documents under the residual hearsay exception.

The jury convicted Turner of conspiracy. The District Court sentenced Turner to 60 months' imprisonment and three years of supervised release. In addition, applying 18 U.S.C. § 3663, the District Court ordered Turner to pay $408,043 in restitution, the full amount of the Government's loss, without considering Turner's ability to pay.

Turner now appeals. He contends that the District Court erred in admitting the recorded conversations under Rule 801(d)(2)(E) because there was no evidence of a conspiracy to recruit members to FAR. In addition, he contends that the District Court erred in admitting the foreign bank documents because (1) the Government did not properly authenticate the documents and (2) the documents admitted under the residual hearsay exception did not have sufficient guarantees of trustworthiness to

conversations were admissible under Rule 801(d)(2)(E) and that there were two conspiracies that the statements were made in furtherance of: (1) the indicted conspiracy to conceal the Leveto's income from the IRS; and (2) the unindicted conspiracy to recruit members to FAR. In admitting the recorded conversations, the District Court did not discuss the Government's contention that the recorded conversations were in furtherance of the indicted conspiracy. Neither party challenges this on appeal.

satisfy Rule 807(a)(1).  Finally, he asserts that the District Court erred in imposing restitution without making specific findings regarding his ability to pay.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

### A. *The Conversations between Leveto and Gonzalez*

Turner contends that the District Court erred in admitting the conversations between Leveto and the undercover IRS agent, Manuel Gonzalez, under Federal Rule of Evidence 801(d)(2)(E) because the Government failed to prove that a conspiracy existed between Turner and Leveto to recruit members to FAR.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement by a "party's coconspirator during and in furtherance of the conspiracy" is not hearsay if it is offered against that party.  For an out-of-court statement to be admissible under this Rule, the Government must prove by a preponderance of the evidence that:  (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy.  *United States v. Ellis*, 156 F.3d 493, 496 (3d Cir. 1998).  To prove these elements, the Government may

8

rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir. 1991); *see also* Fed. R. Evid. 801(d)(2). Statements are admissible under this Rule "even if the basis for admission is a conspiracy different from the one charged." *Ellis*, 156 F.3d at 497.

When a district court concludes that a conspiracy existed, we review the district court's findings as to the elements outlined above for clear error. *Ellis*, 156 F.3d at 496 (citing *United States v. Cruz*, 910 F.2d 1072, 1081 n.11 (3d Cir. 1990)). "Clear error exists when giving all due deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence, we are left with a definite and firm conviction that [a] mistake has been committed." *Commerce Nat'l. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc*., 214 F.3d 432, 435 n.1 (3d Cir. 2000).

Having reviewed the record, we conclude that the District Court did not clearly err in determining that a conspiracy existed to impair the IRS's tax collection efforts by recruiting members to FAR, which assisted members in implementing Turner's fraudulent tax avoidance program. The following independent evidence supports the District Court's decision. First, there was a written agreement between Turner and Leveto to sell *Tax Free!,* and *Tax Free!* directed readers to contact FAR. This directive is not surprising since Turner benefited substantially if his readers joined his organization. The membership fee in 1990 was $10,000. As recruiting FAR members was an obvious purpose of the book, and a

9

benefit to Turner, it is a reasonable inference that Turner and Leveto would have also agreed that Leveto—a FAR member himself and the person interacting with Turner's potential clients—would encourage interested customers to join FAR.

Second, Leveto met with Gonzalez several times *after* he sold Gonzalez the book. One of the meetings occurred when Gonzalez appeared late and unannounced at Leveto's house. Although Leveto and his family were preparing for bed, Leveto met with Gonzalez for almost an hour in Gonzalez's car. It is reasonable to infer that Leveto, who had never met Gonzalez before he sold him *Tax Free!*, continued meeting with Gonzalez after he sold Gonzalez the book to recruit him to Turner's FAR.

Third, Gonzalez received a letter from Turner stating that Leveto had submitted Gonzalez's name as a "qualified candidate" for FAR membership and enclosing a membership application. This supports a finding that Leveto was screening and recommending potential members to Turner.

Finally, Leveto's own statements provide ample evidence of a conspiracy. For example, Leveto repeatedly insisted that Gonzalez attend a membership meeting with Turner to fully understand the program. He assured Gonzalez that Turner would do phone consultations and provided Gonzalez with Turner's telephone and fax numbers. He informed Gonzalez that when two of his friends joined FAR that he, his friends, and Turner met to discuss how best to implement the program for his friends. And he informed Gonzalez that when Gonzalez contacted

him, he alerted Turner.  Each of these statements suggests that Leveto was not simply selling books but was actively recruiting members to FAR.

Based on this evidence, we do not find the District Court's determination that a conspiracy existed to be clearly erroneous.  We will therefore not disturb the District Court's ruling that the recorded conversations were admissible.

*B. The Foreign Bank Documents*

1. Authentication

Turner contends that the District Court erred in admitting Leveto's foreign bank documents because the Government cannot prove their authenticity.  We review a district court's ruling that evidence was properly authenticated for abuse of discretion.  *United States v. McGlory*, 968 F.2d 309, 328 (3d Cir. 1992).

Federal Rule of Evidence 901(a) requires the authentication of evidence before a district court may admit it.  The standard for authenticating evidence is "slight," *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985), and may be satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This Court does not require conclusive proof of a document's authenticity, but merely a prima facie showing of some competent evidence to support authentication. *McQueeney*, 779 F.2d at 928; *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976) (per curiam).  "Once a

prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Goichman*, 547 F.2d at 784.

Federal Rule of Evidence 901(b) provides examples of appropriate methods of authentication, including reliance on "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item." Fed. R. Evid. 901(b)(4). This list is not exhaustive, however, and it is clear that the Government may authenticate documents with other types of circumstantial evidence, including the circumstances surrounding the documents' discovery. *See McGlory*, 968 F.2d at 329 (considering that notes were found in trash outside of defendant's residence as evidence of authenticity); *McQueeney*, 779 F.2d at 929 (considering that documents were produced in response to a discovery request as evidence of authenticity) (citing *Burgess v. Premier Corp*., 727 F.2d 826, 835-36 (9th Cir. 1984) (holding that exhibits found in defendant's warehouse were adequately authenticated simply by their being found there)). We have also considered whether the information included in the evidence is widely known. *See McQueeney*, 779 F.2d at 929-30 (concluding that small number of people who knew the information in the evidence supported finding of authenticity).

The Government easily met its slight burden here. First, the appearance of the documents support their authentication: the documents have the official appearance of bank records. They bear the insignia of foreign banks, *see, e.g*., A. 1735, A. 1784, and contain the type of

12

transaction data typically present on bank records, *see, e.g*., A. 1727, A. 1785. The documents are also internally consistent in their appearance. *Compare* A. 1689 *with* A. 1693.

Second, the contents of the documents provide evidence of their authenticity. The documents were addressed to Leveto's home and business addresses and post office box. *See, e.g*., A. 1718, A. 1722. Several of the documents were responsive to faxes that Leveto sent. And the Government reconciled many of the foreign bank documents with domestic bank records—the authenticity of which Turner does not challenge. Moreover, the bank records included information that was not widely-known, including Leveto's personal account information and aliases.

Third, the IRS seized the records from Leveto's home and office and safes inside Leveto's office, which strongly supports a finding of authenticity because it is likely that Leveto would have stored his bank records there, and his possession of the documents indicates his belief that they were important.

Finally, although we agree with Turner that it is the Government's burden to prove authentication, Turner has not suggested any reason why the Court should doubt the authenticity of the documents. This only bolsters our conclusion that the District Court did not abuse its discretion in concluding that the documents were properly authenticated. As such, we will affirm the District Court's holding that the documents were properly authenticated.

13

## 2. Admissibility

Turner argues that the District Court erred in admitting the foreign bank documents under Federal Rule of Evidence 807 because the Government did not prove that the documents had exceptional guarantees of trustworthiness.[2]  We review for clear error a district court's finding that evidence was sufficiently trustworthy to be admissible under Rule 807.  *United States v. Wright*, 363 F.3d 237, 246 (3d Cir. 2004).

The residual hearsay exception permits a district court to admit an out-of-court statement not covered by Rules 803 or 804 if the court determines that:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807.  The exception is "'to be used only rarely, and in exceptional circumstances' and 'appl[ies]

---

[2] Turner concedes that the foreign bank documents satisfy Fed. R. Evid. 807(a)(2)-(4).

14

only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.'" *Wright*, 363 F.3d at 245 (quoting *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978)). The determination of whether a document is sufficiently trustworthy to be admitted under Rule 807 is a highly fact-specific inquiry. *Id*. at 246. In making this determination, the district court may not rely exclusively on corroborating evidence. *See Bailey*, 581 F.2d at 349.

In *United States v. Pelullo*, we analyzed whether bank records should be admissible under the residual earsay exception and noted that in general, bank records "provide circumstantial guarantees of trustworthiness because the banks and their customers rely on their accuracy in the course of their business." 964 F.2d 193, 202 (3d Cir. 1992).[3] Other courts of appeals have similarly concluded. *See United States v. Wilson*, 249 F.3d 366, 376 (5th Cir. 2001) (admitting foreign bank records under the residual hearsay exception), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005); *United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir. 1989) (same); *Karme v. Comm'r*, 673 F.2d 1062, 1064-65 (9th Cir. 1982) (same).

---

[3] We ultimately excluded the evidence, however, because unlike here, the Government did not notify the defendant that it was introducing the evidence under the residual exception, and the district court did not make explicit findings as to the trustworthiness of the documents. *Id*. at 204.

The District Court concluded that the same evidence that supported the foreign bank documents' authenticity was also sufficient to support the documents' trustworthiness, and therefore, admissibility under Rule 807. Turner contends that this was error for three reasons. First, relying on *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc*., 247 F.3d 79 (3d Cir. 2001), Turner asserts that it is "impossible" to admit the records under Rule 807 because the declarants of the bank documents are unknown. Second, Turner argues that *Karme* and *Wilson* are distinguishable because in those cases, the sources of the documents were banks—in contrast to here, where the IRS seized the documents from Leveto's residence and business. Third, Turner maintains that the District Court improperly relied only on corroborating evidence in admitting the documents.

We find that Turner's arguments lack merit and that the District Court did not clearly err in concluding that the documents possessed sufficient indicia of trustworthiness. First, contrary to Turner's assertion, the Government is not required to identify the declarant of the foreign bank documents in order for the documents to be admissible under Rule 807. *See Wilson*, 249 F.3d at 375-76 (admitting bank records under the residual hearsay exception with no mention of declarant); *Nivica*, 887 F.2d at 1127 (same); *Karme,* 673 F.2d at 1064-65 (same); *see also* Fed. R. Evid. 807. *Bohler-Uddeholm* does not suggest otherwise. In *Bohler-Uddeholm,* this Court affirmed the district court's ruling admitting the affidavit of a person who died before trial under Rule 807. We explained that the factors that the district court analyzed in admitting the affidavit, including whether the declarant was known and

16

whether the statements were based on personal observation, were sufficient for this Court to uphold the district court's order. *Bohler-Uddeholm*, 247 F.3d at 113. We did not hold, however, that these factors were necessary for hearsay evidence to be admissible under Rule 807, and we decline to require those factors here where many of the documents were computer-generated.

Second, as discussed *supra*, that the IRS seized the documents from Leveto's residence, office, and safes within his office, weighs in favor of the reliability of the documents—not against it. Turner does not dispute that the IRS seized the documents from Leveto. He does not identify any break in the chain of custody of the documents. And he does not suggest any reasons why Leveto would have been storing false bank documents that implicated him in tax fraud.

Third, the District Court did not improperly rely only on corroborating evidence in admitting the bank records. As detailed above, the District Court relied on: (1) the appearance of the records, including their internal consistency; (2) the contents of the records; and (3) the circumstances surrounding the discovery of the records. Those grounds are entirely legitimate.

Finally, it bears repeating that Turner has not identified any document that he claims is a forgery or in any way inaccurate. Accordingly, we will not disturb the ruling of the District Court.

17

## C. Restitution

Turner argues that the District Court erred in imposing restitution under 18 U.S.C. § 3663 because it required him to pay the full amount of the Government's losses without making specific findings regarding his ability to pay. For the first time on appeal, the Government urges, however, that 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act ("MVRA"), applies. Under the MVRA, a sentencing court is required to order a defendant to pay the full amount of a victim's losses without considering the defendant's economic circumstances. *Id*. § 3664(f)(1)(A). Thus, under the MVRA, the Government contends that the District Court's restitution award was proper. We review the legality of a restitution order de novo and review specific awards for abuse of discretion. *United States v. Graham*, 72 F.3d 352, 355 (3d Cir. 1995).

As an initial matter, we will address Turner's contention that the Government waived the argument that the MVRA applied by not urging it before the District Court. While it is a general rule that arguments raised for the first time on appeal are waived, the waiver principle "is only a rule of practice and may be relaxed whenever the public interest or justice so warrants." *Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) (internal citations omitted). Indeed, we have been reluctant to apply the waiver doctrine if the issue raised is solely one of law and no additional fact-finding is necessary. *Id*. at 417-18. Here, whether the MVRA applies is a pure question of law. Neither party disputes the District Court's factual findings or suggests that further development of the record would

18

assist the resolution of this matter. Moreover, we have not previously addressed whether the MVRA applies to 18 U.S.C. § 371 offenses, and therefore, we find it particularly appropriate to reach the issue.

The MVRA provides for mandatory restitution to the victims of certain identified offenses, including offenses "against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1). MVRA does not define "offenses against property." We have held that this term includes offenses involving money. *See United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001) (imposing restitution under the MVRA for money laundering offense).

The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). The MVRA's enforcement provision expressly identifies the government as an eligible victim by providing: "[i]n any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution." *Id*. § 3664(i); *see also Diaz*, 245 F.3d at 312 (finding that United States Department of Education is a victim under MVRA). District courts ordering restitution under the MVRA must "order restitution to each victim in the full amount of each

victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

Turner asserts that he did not commit an "offense against property" in conspiring to defraud the IRS of Leveto's tax dollars, arguing that Leveto's unpaid taxes are not the IRS's property because the IRS never possessed the money. Contrary to Turner's assertion, his success in keeping Leveto's tax dollars out of the hands of the IRS does not make the taxes Leveto owes to the IRS any less the IRS's property. Depriving a person of something that lawfully belongs to him does not render whatever is owed *not* his property. Certainly, obligations owed to someone—for instance, their accounts receivable—are "assets" and therefore property. *See Pasquantino v. United States*, 544 U.S. 349, 355-356 (2005) (stating that the right to collect previously uncollected excise taxes is "'property' in [a Government's] hands", and that "[t]his right is an entitlement to collect money . . . , the possession of which is 'something of value' to the Government. . . ."). As such, we conclude that Turner's conspiracy to defraud the IRS of its *property*, Leveto's tax dollars, in violation of 18 U.S.C. § 371, is an "offense against property under this title [title 18]," and consequently covered by the MVRA. Our conclusion is consistent with the position of other courts that have decided this issue. *See United States v. Meredith*, 685 F.3d 814, 827 (9th Cir. 2012) (applying MVRA to conspiracy to defraud the IRS in violation of 18 U.S.C. § 371); *United States v. Campbell*, No. 1:07-cr-239-5, 2009 WL 4885231, at *4 (W.D. Mich. Dec. 15, 2009) (same).

Applying the MVRA, we find that the District Court did not err in ordering Turner to pay $408,043 in restitution to the Government. As noted, the MVRA prohibited the District Court from considering Turner's economic circumstances in ordering restitution. Moreover, the parties do not contend that the MVRA provides a different method for calculating the Government's tax loss than § 3663, and Turner does not contest that the District Court's award accurately reflects the Government's loss. As a result, we will affirm the District Court's $408,043 restitution order.

## VI.

For the reasons discussed above, we will affirm the District Court's judgment of conviction. In addition, we will affirm the District Court's order of restitution in the amount of $408,043.