**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2110
_____

UNITED STATES OF AMERICA

v.

JOSEPH CAMMARATA,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:21-cr-00427-001)
District Judge:  Honorable Chad F. Kenney
_____

Argued September 19, 2024

Before:  RESTREPO, McKEE, and SMITH,
*Circuit Judges*

(Filed: July 22, 2025)

Peter Goldberger [**Argued**]
Law Office of Peter Goldberger
P.O. Box 645

Ardmore, PA 19003
          *Counsel for Appellant*

David J. Ignall
Paul G. Shapiro [**Argued**]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
          *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**SMITH**, *Circuit Judge.*

"The class action is an ingenious procedural innovation[,]" wrote Judge Richard Posner in *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014). As he explained, it "enables persons who have suffered a wrongful injury, but are too numerous for joinder of their claims alleging the same wrong committed by the same defendant or defendants to be feasible, to obtain relief as a group, a class as it is called." *Id.*

Yet no matter how inspired a concept the class action device may be, it is not entirely resistant to the designs of fraudsters bent on abusing it—in this case, by imposters claiming settlement proceeds to which they had no lawful right.

This appeal presents us with issues arising out of a unique intersection of federal sentencing principles and class action settlement practice. Joseph Cammarata and two confederates developed an elaborate scheme by which they submitted fraudulent claims to administrators of securities class action settlement funds. None of the three were class members, yet their efforts yielded them over $40 million. Two of the men entered guilty pleas pursuant to agreements. Cammarata, though, proceeded to trial and was found guilty by a jury of all charges filed against him.

In addressing the issues raised by Cammarata's appeal, we uphold all but one of the District Court's rulings, remanding for the District Court to allow the Government to move to amend the Court's forfeiture order.

## I. BACKGROUND

Joseph Cammarata and his business partners, Eric Cohen and David Punturieri (collectively "Defendants"), joined forces to create Alpha Plus Recovery, LLC ("Alpha Plus") in 2014. Alpha Plus was a claims aggregator,[1] with a

---

[1] An extensive search for a formal definition of a class action "claims aggregator" yielded only a definition from a treatise which cites the complaint filed against Cammarata by the Securities and Exchange Commission in a parallel civil case. It explains that claims aggregators "are companies that solicit absent class members to provide services, including (i) filing settlement claims on their behalf, (ii) compiling, where necessary, documentation or information to support those claims, and (iii) communicating with the claims administrator

3

business model that revolved around securities class action settlements. Class actions generally involve hundreds, if not thousands, of class members. When a class action settles, some class members may conclude that the time and effort required to submit a small or modest claim outweigh any potential for obtaining a meaningful award from the settlement fund. Claims aggregators seek to remedy that dilemma. In exchange for a percentage of a client's monetary recovery, claims aggregators complete necessary paperwork and then submit aggregated claims to a settlement administrator on behalf of numerous class-member clients.

An administrator of a settlement reviews each claim—whether filed by an individual class member or by an aggregator—to ensure that the claimant fits within the definition of a class as set forth in the court order certifying the class.[2] Those who qualify as class members thereby become

---

to perfect, cure, supplement, or otherwise oversee the claims filing process through inception to distribution of funds." *Class Actions and Other Complex Litig.: Ethics* § 4.01 (2024) (citing Compl. ¶¶ 37–38, *SEC v. Cammarata, et al.*, No. 21-cv-4845, ECF No. 1 (E.D. Pa. Nov. 11, 2021)). While the term "claims aggregator" may not be generally known in legal practice, a class action claims administrator who testified at trial in this case confirmed that claims aggregators are "part of the industry[.]" App. 547.

[2] Federal Rule of Civil Procedure 23, which governs class actions filed in the federal court system, requires the presiding district judge to "define the class[.]" Fed. R. Civ. P.

entitled to payment from the settlement fund. In a securities class action, a qualified member is typically a person or entity who purchased or owned shares of a security issued by an entity which has been sued under federal securities laws at a time, or during a period, specified in the class definition. When aggregators submit claims on behalf of their clients, it becomes the administrator's responsibility to investigate whether the clients satisfy the definitional criteria.

From 2014 to 2021, Alpha Plus submitted hundreds of claims to administrators who were overseeing nearly 400 securities class action settlements filed in both federal and state courts. The company did so primarily on behalf of three clients: Nimello Holding LLC ("Nimello"), Quartis Trade and Investment LLC ("Quartis"), and Inversiones Invergasa SAS ("Invergasa"). In its submissions to claims administrators,

---

23(c)(1)(B). Accordingly, a court's order certifying a class must include "a readily discernible, clear, and precise statement of the parameters defining the class[.]" *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006). Class definitions in securities class actions ordinarily resemble the following: All persons who purchased or owned shares of the defendant entity's stock during a particular timeframe and who suffered damages as a result of that purchase or ownership. *See, e.g.*, App. 1979 (defining the class as "[a]ll Persons who purchased shares of EndoChoice common stock pursuant or traceable to EndoChoice's [IPO] Offering Materials on or before August 3, 2016, and who were damaged thereby").

5

Alpha Plus represented that Nimello was a hedge fund located in Gibraltar, that Quartis was a hedge fund located in the Bahamas, and that Invergasa was an entity located in Colombia. Those submissions contained a number of misrepresentations.

Nimello, Quartis, and Invergasa were not hedge funds—they were defunct foreign shell companies acquired by the Defendants. The directors of Nimello and Quartis, along with Invergasa's president, were associated with Joseph Cammarata.[3] David Punturieri had incorporated a separate "Nimello" entity in New Jersey in 2015, named Nimello Holding LLC ("NJ Nimello"); incorporation documents listed Erik Cohen and Joseph Cammarata as officers and directors. And a separate Quartis Trade and Investment LLC ("NJ Quartis") had been incorporated by Cohen in New Jersey in 2014. Cohen listed himself and Punturieri as members[4] and added Cammarata as an owner in 2017.[5] The Defendants

---

[3] The directors of Nimello and Quartis were not charged in the indictment, nor was Invergasa's president.

[4] The superseding indictment stated that Cohen and Punturieri were listed as "members/managers" of NJ Quartis. App. 98.

[5] As the Presentence Investigation Report recommended, PSR ¶ 67, Cammarata received a sentencing enhancement because his offense involved "sophisticated means[,]" such as "acquir[ing] foreign shell companies" and "portray[ing] these companies as hedge funds." App. 2068.

subsequently opened bank accounts in the names of NJ Nimello and NJ Quartis.

In support of the claims that Alpha Plus submitted to claims administrators, it included falsified spreadsheets purporting to show that Nimello, Quartis, and Invergasa had traded in securities of certain companies named as defendants in actual securities class actions that had been settled. In fact, the three entities never actually traded in those or any other securities. When claims administrators sought additional documentation that might confirm some suspect trades, the Defendants created and submitted further fabricated reports which listed fictitious transactions.

Some of those fabricated reports purported to have been authored by SpeedRoute, a broker dealer Cammarata founded in 2010, and which he sold in 2015.[6] For example, the Defendants altered real trade data from SpeedRoute and submitted it to claims administrators representing falsely that Nimello, Quartis, or Invergasa had made the trades. In other instances, when Alpha Plus submitted claims on behalf of the three entities, it identified SpeedRoute as the entities' brokerage firm and listed Cammarata as SpeedRoute's point of contact. When claims administrators pressed for further proof of trading, Cohen and Cammarata worked together to create fictitious SpeedRoute reports and submit them to the claims administrators. SpeedRoute itself was a legitimate entity and had no role in creating those reports. Most importantly, it never executed a trade on behalf of Nimello, Quartis, or Invergasa.

---

[6] Cammarata remained SpeedRoute's CEO until 2018.

As scrutiny of the claims submitted by Alpha Plus grew more intense, the Defendants resorted to other tactics in an effort to deceive administrators. In 2015, for example, a claims administrator asked several follow-up questions about supporting documents for trades ostensibly made by Quartis. The Defendants responded by falsely suggesting that SpeedRoute was Quartis's broker dealer. Cohen created an email account which he used to pose as the principal of Quartis, then sent an email to Cammarata purporting to ask for information that he could provide to the inquiring claims administrator. Cammarata drafted an email from his SpeedRoute account which offered a contrived explanation. Punturieri forwarded that email to the claims administrator, touting it as a justification for the claim from Quartis's broker dealer.

In 2020, the Defendants' scheme hit a snag. One claims administrator, KCC, asked to be provided with data that supported the trades allegedly underlying claims by Nimello and Quartis. Punturieri, pretending to be an Alpha Plus employee named "Paul Delfino," sent KCC two reports ostensibly authored by SpeedRoute. But Dan Dearden, a financial crimes investigator employed by the parent company of KCC, had begun to work with government investigators. He referred the reports on to SpeedRoute, asking for verification of their authenticity. SpeedRoute's Chief Compliance Officer responded that the company had not produced the reports and did not recognize Nimello or Quartis as clients. Around this same time, Dearden made a similar request for further information about trades supposedly made by Invergasa.

The Defendants' scheme had begun to unravel.

8

Because SpeedRoute could not verify the trades, Dearden insisted that he speak with someone at Nimello, Quartis, and Invergasa. Without such an assurance, Dearden told Punturieri that he would reject the claims. Desperate to give the phony claims an appearance of legitimacy, Cohen impersonated Nimello's principal in a conversation he had with Dearden. And the Defendants instructed Cammarata's business partner in Colombia as to what he should say on Invergasa's behalf in a separate phone call he was to have with Dearden. When the Invergasa call went poorly, Cammarata went so far as to suggest to his co-defendants that he personally go to Dearden's home and offer him a $1 million bribe. He elected, though, to abandon such an overture.

The conspirators' desperation could hardly have been assuaged when KCC rejected the Alpha Plus claims, and when other claims administrators did likewise.

All told, claims administrators paid Alpha Plus approximately $40 million for claims made on behalf of Nimello, Quartis, and Invergasa from 2014 to 2021. The Defendants transferred that money to bank accounts they held, including the NJ Nimello and NJ Quartis accounts,[7] for their personal benefit.

---

[7] The Defendants incorporated NJ Nimello and NJ Quartis so they could deposit settlement funds into those entities' bank accounts. Claims administrators would sometimes send settlement funds directly to Alpha Plus. In other instances, claims administrators wrote checks to Nimello Holding LLC and/or Quartis Trade and Investment LLC, thinking those

On October 28, 2021, a grand jury sitting in the Eastern District of Pennsylvania returned a single-count indictment charging the Defendants with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. Authorities arrested Cammarata six days later.[8] A grand jury returned a twelve-count superseding indictment in September of 2022, charging the Defendants as follows:

- Conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, at count one against all Defendants;
- Wire fraud, in violation of 18 U.S.C. § 1343, at counts two through five against all Defendants;
- Conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), at count six against all Defendants;

---

entities were foreign hedge funds and Alpha Plus clients. But the Defendants would deposit those checks into the bank accounts of the New Jersey LLCs they had incorporated under either the Nimello or Quartis names.

[8] Cammarata was initially released on bail, with conditions including requirements that he live with his parents in New York, abide by a curfew, and wear a location monitoring device. But the District Court revoked his bail in March 2022 after concluding there was probable cause to believe Cammarata had committed a federal offense while on release, and that Cammarata was unlikely to abide by any conditions of release.

- Money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, at counts seven through ten against all Defendants; and
- Money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1957 and 2, at counts eleven and twelve against Cammarata only.

Cammarata's co-Defendants, Punturieri and Cohen, pled guilty to counts one and six on October 13 and 14, 2022, respectively. The day after Cohen entered his guilty plea, the District Court granted the Government's motion to dismiss the money laundering charges at counts seven through ten as to all three Defendants. Only Cammarata proceeded to trial on the remaining counts a week later.

Both Punturieri and Cohen cooperated with the Government and testified at the trial. Punturieri described Cammarata as the "overseer" of the fraudulent scheme. App. 1326. And both Punturieri and Cohen detailed the false submissions the Defendants had made to claims administrators on behalf of Quartis, Nimello, and Invergasa. Several claims administrators, as well as Dearden, also testified at trial.

Cammarata testified on his own behalf. He conceded that he had lied to claims administrators by falsely representing that Quartis, Nimello, and Invergasa had traded the securities involved in the class action settlements. But by Cammarata's telling, the scheme was lawful because he had *personally* traded the subject securities and then assigned those trades to Quartis, Nimello, and Invergasa. The trades were all real, he claimed, and his assignments rendered the three entities the

11

"beneficial owners" of the trades, entitling them to settlement funds. App. 1594. Still, Cammarata admitted on cross-examination that he never informed the claims administrators that he had made any assignments.

After a six-day trial, the jury found Cammarata guilty on all counts. The District Court sentenced him on June 6, 2023. The Court calculated Cammarata's guideline imprisonment range to be 168 months to 210 months. Despite Cammarata's being unrepentant throughout the sentencing proceeding, the District Court granted him a downward variance. He was sentenced to 120 months' imprisonment and ordered to pay restitution and to forfeit certain property.

This appeal followed.[9]

## II.    DISCUSSION

Cammarata raises five issues in this appeal. First, he claims that the trial evidence and the Government's closing argument constructively amended the superseding indictment. Second, he argues that the District Court violated the Federal Rules of Evidence by permitting the Government to cross-examine him about his purchase of a private island and portions of his tax returns. Third, he contends that the District Court, in applying the Sentencing Guidelines, erroneously calculated the amount of loss caused by his offenses. Fourth,

---

[9] The District Court had jurisdiction under 18 U.S.C. § 3231. Cammarata timely filed a notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

he avers that the District Court's restitution order ran afoul of the Mandatory Victims Restitution Act. And fifth, he claims the District Court improperly ordered the forfeiture of his vacation home.

We address each issue in turn.

## A. Constructive Amendment

Cammarata argues that a constructive amendment of the superseding indictment occurred during trial and that his conviction should therefore be set aside. We are not persuaded.

Our review of a properly preserved constructive amendment claim is plenary. *United States v. Fallon*, 61 F.4th 95, 111 (3d Cir. 2023). Yet Cammarata failed to raise his constructive amendment claim until he filed a post-trial motion. We therefore review Cammarata's claim for plain error. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) (explaining that constructive amendment claims raised for the first time after trial—*e.g.*, in a post-trial motion—are reviewed for plain error) (citing *United States v. Tiller*, 302 F.3d 98, 105 (3d Cir. 2002)). Plain error review hinges on whether the error prejudiced the defendant.[10] *United States v.*

---

[10] More specifically, to prevail under the plain-error framework, an appellant must "show (1) a legal error (2) that is plain and (3) that has affected his substantial rights." *United States v. Dorsey*, 105 F.4th 526, 528 (3d Cir. 2024) (citing *United States v. Olano*, 507 U.S. 725, 732–33 (1993)). If those three prongs are satisfied, we have "discretion to correct the error if (4) it seriously affects the fairness, integrity, or

13

*Greenspan*, 923 F.3d 138, 149 (3d Cir. 2019). Because a constructive amendment is a "*per se* violation of the fifth amendment's grand jury clause[,]" *United States v. Castro*, 776 F.2d 1118, 1121–22 (3d Cir. 1985), we presume prejudice when a constructive amendment has occurred, *United States v. Syme*, 276 F.3d 131, 154 (3d Cir. 2002).[11]

A constructive amendment occurs where trial evidence or arguments "modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense" charged in the indictment. *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006). This may take place if the trial evidence or arguments "'broaden[] the possible bases for conviction from that which appeared in the indictment[.]'" *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004) (emphasis omitted) (quoting *United States v. Asher*, 854 F.2d 1483, 1497 (3d Cir. 1988)). So our "key inquiry" is whether "the defendant was convicted of the same conduct for which he was indicted." *Daraio*, 445 F.3d at 260 (internal quotation marks and citation omitted).

Cammarata advances two constructive amendment arguments. First, he argues that the trial evidence failed to

---

reputation of judicial proceedings." *Id.* (citing *Olano*, 507 U.S. at 732).

[11] We also held in *Syme* that the government can rebut the presumption that a constructive amendment was prejudicial. 276 F.3d at 154–55. We need not reach that inquiry because we conclude no constructive amendment took place.

14

prove the superseding indictment's assertion that all class-member claimants to those settlements targeted by the scheme had to show that they purchased shares of the subject security during the relevant time period, and that they were damaged thereby.[12] Second, he contends that the Government broadened its theory of fraud when it countered his assignment defense during closing argument.

Cammarata's first argument seizes on the factual complexities of his wire fraud offenses, given the intricacies of the claims administration process and the numerous securities class action settlements that were affected. He cherry picks some testimony from two claims administrator employees, James Facciolla and Tina Chiango, and contends that that testimony undermined the need for a class action settlement claimant to prove that it actually purchased a subject security and suffered damages from that purchase.

Our reading of Facciolla and Chiango's testimony does not substantiate Cammarata's argument.

---

[12] Cammarata's argument focuses on paragraph 11 of the superseding indictment. That paragraph provides that all claimants to security class action settlements, "including those represented by claims aggregators such as Alpha Plus," were required to show two "essential facts" to qualify for an award of settlement funds: (1) "that they had bought shares of the subject security during the time period set forth in the court-approved settlement agreement[,]" and (2) that "they had suffered damages as a result of their purchase of securities." App. 97.

15

Cammarata claims Facciolla's testimony disproved the superseding indictment's assertion that claimants were required to demonstrate that they purchased shares of the subject security to qualify for payment. Facciolla explained that when submitting claims, aggregators like Alpha Plus must provide their clients' trade data and identify "the underlying beneficial owner[,]" defining a "beneficial owner" as "the person who has [the] rights to . . . the underlying shares." App. 504. In Cammarata's view, that seems to suggest that a claims aggregator's clients may not need to be the persons or entities to actually purchase the subject securities to qualify for payment of their claims. Yet when the prosecutor focused on the claims that Alpha Plus had submitted to Facciolla's employer, asking Facciolla if "Nimello itself ha[d] to make a purchase" of the subject security "to make a claim," Facciolla responded in the affirmative. App. 510. So Cammarata is simply wrong, and the testimony is consistent with the superseding indictment's allegation that claimants "represented by claims aggregators such as Alpha Plus" were required to "demonstrate that they had bought shares of the subject security during the [relevant] time period[.]" App. 97; *see also* App. 1251–52 (another claims administrator testifying that to qualify for payment, a claimant had "to have bought the stock during the class period").

So too with respect to Chiango's testimony. Cammarata claims her testimony was contrary to the superseding indictment's averment that claimants were required to demonstrate that they had suffered damages to qualify for payment. In his view, her testimony demonstrated that claimants need only show a "recognized loss"—not damages—to qualify. Opening Br. at 22. Chiango explained

16

that the portion of the settlement fund to which a claimant is entitled is "based on the recognized loss that was calculated for the plan of allocation[,]"[13] a plan that was approved by a judge pursuant to the class action settlement. App. 1483. Yet Chiango went on to explain that if claimants "don't have damages, per the plan of allocation that we have to follow, then they are not entitled to any distribution." App. 1484. The court-approved plan of allocation establishes the amount to which all claimants are entitled based on their recognized losses, but that does not negate the fact that claimants must still show they suffered damages if they are to qualify to receive payment. Chiango's testimony is entirely consistent with the superseding indictment's allegation that claimants "needed to show they had suffered damages as a result of their purchase of securities." App. 97; *see also* App. 1979 (defining a class as persons "who purchased shares of" the subject security and "who were damaged thereby").

---

[13] "A plan of allocation is a stated methodology by which a class action recovery is allocated among eligible claimants; literally, it is a plan for allocating the settlement fund." Stevie Thurin, *A Guide to Settlement Plans of Allocation in Securities Class Actions*, AM. BAR ASS'N (Nov. 15, 2018), https://www.americanbar.org/groups/litigation/resources/new sletters/securities/a-guide-to-settlement-plans-allocation-securities-class-actions/. Ordinarily, the plan of allocation provides a formula by which to calculate claimants' recognized losses. *See* App. 1983–86. The ultimate allocation of settlement funds is based on each claimant's recognized losses, as calculated by the plan of allocation.

Accordingly, Cammarata's overly-selective references to the trial testimony of Facciolla and Chiango fall short of contradicting averments in the indictment. The testimony of the two witnesses was consistent with the Government's theory of guilt and the means by which class action settlements were to be administered.

We likewise reject Cammarata's argument that the Government constructively amended the superseding indictment during its summation. Our constructive amendment analysis hinges on whether "an element of the offense for which [Cammarata] was convicted was different from an element of the offense for which it appears from the face of the indictment he was charged." *United States v. Bryan*, 483 F.2d 88, 96–97 (3d Cir. 1973). And *Fallon* reminds us that "[t]rial evidence, arguments, or the district court's own instructions can all form the basis of constructive amendments." 61 F.4th at 111.

Cammarata's theory boils down to his contention that the Government, during its closing argument, broadened its claim of fraud in the course of countering his assignment defense.[14] Yet none of the prosecutor's comments during summation on Cammarata's theory of assignment "'broaden[ed] the possible bases for conviction'" from those

---

[14] Wire fraud requires the Government to prove beyond a reasonable doubt that the defendant used interstate wire communication to engage in a scheme or artifice to defraud for the purpose of obtaining money or property with a specific intent to defraud. *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012).

18

which appeared on the face of the superseding indictment. *Lee*, 359 F.3d at 208 (quoting *Asher*, 854 F.2d at 1497)). The Government simply rebutted the defense theory, pointing out why Cammarata's testimony was implausible.

The Government argued, quite understandably, that Cammarata's theory that he assigned his personal trades to Nimello, Quartis, and Invergasa made no sense. If Cammarata had personally bought securities and was thereby entitled to a share of settlement proceeds, why, the Government asked the jury, would he have made up three clients and have pretended that it was they who had purchased and sold those securities? The Government acknowledged that if Cammarata was, in fact, the beneficial owner of a security issued by a company that had settled any of the relevant class action cases, he was entitled to submit a claim in his own name. But, as the Government pointed out, no evidence was presented to show that Nimello, Quartis, and Invergasa were ever the beneficial owners of subject securities. And, even if Cammarata had assigned his personal trades to Nimello, Quartis, and Invergasa, he never advised the claims administrators of those assignments. To properly administer the settlement, they were entitled to that information.

It is always permissible for the Government to "comment on the weakness of the defense case in closing arguments." *United States v. Jackson*, 540 F.3d 578, 596 (7th Cir. 2008) (citation omitted). That is simply how the adversary system works in criminal trials. And as the Seventh Circuit has explained, rebutting a defense theory does not constructively amend an indictment. *United States v. McAnderson*, 914 F.2d 934, 945 (7th Cir. 1990). Countering a weak defense theory

19

was all the Government did here. Its rebuttal cannot reasonably lead one to believe that Cammarata was convicted for anything other than the crimes charged.

Cammarata has failed to direct our attention to any constructive amendment of the superseding indictment during trial.

## B. Evidentiary Challenges

Cammarata claims that two areas of inquiry during his cross-examination violated Federal Rules of Evidence 403 and 404(b) by unfairly portraying him as a "hugely wealthy cheat[,]" and by improperly suggesting commission of an uncharged crime. Opening Br. at 37. We disagree.

### 1. Cammarata's Private Island Purchase

Cammarata filed a motion in limine shortly before trial in which he sought, *inter alia*, to preclude the Government from introducing evidence that he owned a private island. The District Court denied Cammarata's motion without prejudice, deferring its ruling until the time of trial.

On the fifth day of trial, the Government informed the District Court, at sidebar, that it planned to cross-examine Cammarata about his $5 million purchase of a private island in 2015. The prosecutor explained to the District Court that Cammarata had sent an email to Cohen stating that he would have a "decent monthly [financial] burn" if he purchased the island. App. 1734. Defense counsel objected, citing Federal Rule of Evidence 403 and arguing that Cammarata had already testified he had a "burn rate" and that the evidence was unfairly prejudicial. App. 1648. The District Court overruled the

objection. On the witness stand, Cammarata acknowledged purchasing the island but claimed that the email to Cohen about a potential financial burn had been falsified.

Cammarata challenges the District Court's ruling by arguing that the judge failed to conduct a proper Rule 403 analysis and, at all events, the probative value of the evidence was outweighed by its tendency to generate class-based prejudice in portraying him as wealthy.

We review the District Court's decision to admit evidence over a Rule 403 challenge for abuse of discretion and construe such discretion "especially broadly." *United States v. Scarfo*, 41 F.4th 136, 178 n.35 (3d Cir. 2022). Rule 403 permits courts to exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403. In reaching a Rule 403 determination, a district court is required to balance those two competing considerations. *United States v. Heatherly*, 985 F.3d 254, 265 (3d Cir. 2021).

We "strongly prefer" that a district court detail its Rule 403 balancing on the record. *Egan v. Del. River Port Auth.*, 851 F.3d 263, 277 (3d Cir. 2017). But in the absence of a detailed balancing statement, we may undertake the analysis ourselves. *Id.* We have declined to balance the Rule 403 factors "de novo only where a district court [has] said nothing about particular evidence's probative value or prejudicial effect." *Greenspan*, 923 F.3d at 151.

The District Court overruled defense counsel's objection, pointing out that "there [had been] a suggestion to the jury, as part of the defense, that [Cammarata] did not need

21

this money, so he did not have to involve himself in this [criminal] activity." App. 1649. The Court was correct in noting that the defendant had "opened the door" to the inquiry, and that his denial that he needed money clearly spoke to the probative value of the evidence. But the District Court said nothing about any risk of unfair prejudice. Because the District Court failed to conduct the necessary balancing analysis, we undertake that analysis ourselves. *See Egan*, 851 F.3d at 277.[15]

The evidence showed Cammarata had suggested to Cohen that the $5 million island purchase could cause him monthly financial strain. He had purchased the island in 2015, and the superseding indictment alleged he committed wire fraud in wrongfully obtaining millions of dollars from class action settlement funds between the years 2014 and 2021. So the evidence not only rebutted Cammarata's defense that he "did not need money[,]" App. 491; it also suggested a financial motive for his fraud, *see United States v. Saada*, 212 F.3d 210, 224 (3d Cir. 2000) (explaining that evidence was "highly probative because it rebutted the defense's contention"); *United States v. Foster*, 891 F.3d 93, 110 (3d Cir. 2018) (reasoning that the government was "entitled to rebut" the defendant's argument "by presenting evidence of his motive"). The probative value of the evidence was, therefore, significant.

---

[15] We have repeatedly "renew[ed] our admonition that district courts articulate their Rule 403 reasoning on the record." *United States v. Heinrich*, 971 F.3d 160, 165 (3d Cir. 2020). "A basic part of the balancing process requires making a record. It is simple to do and essential to effective appellate review." *Id.*

But, as noted above, that does not end our inquiry. We must ask the question the District Court failed to address: was the probative value of the evidence substantially outweighed by any risk of unfairly portraying Cammarata as wealthy?

"Not all prejudice is unfair prejudice, and Rule 403 bars only the latter." *United States v. Long*, 92 F.4th 481, 488 (3d Cir. 2024). To meet this threshold, admission of the evidence must unfairly advantage one of the parties. *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 n.6 (3d Cir. 2002). Importantly, we evaluate any prejudicial effect "in the context of the totality of the evidence produced." *United States v. Williams*, 974 F.3d 320, 357 (3d Cir. 2020).

Cammarata concedes that by the time the evidence was introduced, it "was undisputed, and otherwise established, that [he] was wealthy and controlled many businesses." Opening Br. at 31. Defense counsel explained in his opening statement that he had previously asked the jury "if anybody had any problems with somebody who is wealthy." App. 495–96. And counsel went on to state that Cammarata "had money[,]" "nice things[,]" and "a lot of bank accounts[.]" App. 495–96.

Cammarata himself testified that he had sold businesses for $31 million, $20 million, and over $3 million. He explained that at the time of his arrest, he "was literally at the pinnacle of [his] career"—he "was active in approximately 30 businesses," "was the CEO of a public company[,]" and "had just been named CEO of a two billion dollar social media company." App. 1587. When cross-examining Punturieri, it was defense counsel who elicited testimony that Cammarata owned a house in the Bahamas.

23

To put it mildly, Cammarata was not shy about presenting himself to the jury as someone who had enjoyed considerable financial success.

In summary, the jury was made aware of Cammarata's wealth by the defendant's own testimony and before it heard that he had purchased a private island. No prejudice could reasonably have resulted from admission of the private island evidence, let alone unfair prejudice that could have substantially outweighed the probative value of that evidence. *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 88 (3d Cir. 2019) (reasoning that there was no unfair prejudice where the jury was "already alerted" to the subject matter the evidence supported); *United States v. Johnson*, 302 F.3d 139, 152 (3d Cir. 2002).

The District Court did not abuse its discretion in overruling defense counsel's Rule 403 objection.

## 2. Cammarata's Tax Returns

One of the Government's trial witnesses was Stacey Esimai, an auditor who worked in the U.S. Attorney's Office for the Eastern District of Pennsylvania. She testified that she had reviewed financial records covering the period from 2015 to 2020, and that they showed that Cammarata had transferred some of the money he had improperly obtained from class action settlement funds to a bank account in the name of PB Trade, a company he had started around 2007.

When Cammarata testified in his own defense, the prosecutor asked him whether he had reported the settlement money Alpha Plus sent to PB Trade on his tax returns.

24

Cammarata responded that he had realized offsetting losses, leading the prosecutor to show Cammarata his 2017, 2018, and 2019 tax returns.[16] Focusing his questions on Cammarata's Schedule C submissions for PB Trade in the tax returns, the prosecutor noted that there was no income attributed to the company. And when he pressed Cammarata as to whether he had ever informed the accountant who prepared the tax returns about the money Alpha Plus sent to PB Trade, Cammarata had several answers. He responded that he "may have[.]" App. 1740. And also that the company "may have" had offsetting losses. App. 1739. And also that he did not recall. *Id.* At one point during this exchange, defense counsel objected, but only to the relevancy of the inquiry. That objection was overruled.

Cammarata now claims on appeal that the Government sought testimony that violated Federal Rules of Evidence 404(b) and 403. According to him, the Government was improperly suggesting he committed the uncharged crime of tax fraud without first having complied with Rule 404(b)'s notice requirement.[17] Also, according to Cammarata, the District Court erred by failing to provide the jury with a proper limiting instruction. Finally, he argues that any slight probative

---

[16] The Government introduced Cammarata's tax returns as marked exhibits, but used them only for cross-examination. It never sought to admit them into evidence, and so the jury had no access to them.

[17] Rule 404(b) requires that a prosecutor in a criminal case "provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it[.]" Fed. R. Evid. 404(b)(3)(A).

25

value of questioning him about his tax returns was outweighed by the risk of unfair prejudice, confusing the issues, and misleading the jury.

Before reaching the merits of Cammarata's arguments that use of the tax returns by the Government was improper, we must determine whether he properly preserved them for appeal. *See United States v. Sandini*, 803 F.2d 123, 126 (3d Cir. 1986). Federal Rule of Evidence 103(a)(1) restricts our review of evidentiary errors to those in which the complaining party "state[d] the specific ground" for objection, "unless it was apparent from the context[.]" Fed. R. Evid. 103(a)(1)(B). Defense counsel objected to questions regarding Cammarata's tax returns solely on relevancy grounds. Counsel mentioned neither Rule 403 nor Rule 404(b), so any supposed reliance on those Rules was not apparent from the context of the objection. *See Sandini*, 803 F.2d at 126.

Because Cammarata failed to preserve his arguments for appeal, *id.*, we review for plain error. *See United States v. Mitchell*, 365 F.3d 215, 257 (3d Cir. 2004).[18]

### a. Rule 404(b)

Rule 404(b) prohibits the introduction of evidence of "any other crime, wrong, or act" to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Its purpose is to keep from a jury evidence that suggests a person has a propensity to commit crimes "'or is otherwise a bad person[.]'" *United States v. Green*, 617 F.3d 233, 249 (3d Cir.

---

[18] *See supra* note 10.

2010) (quoting *United States v. Taylor*, 522 F.3d 731, 735–36 (7th Cir. 2008)).

Rule 404(b) applies only to extrinsic evidence. *United States v. Bailey*, 840 F.3d 99, 128 (3d Cir. 2016). It does not apply to intrinsic evidence, which "does not constitute a prior bad act at all[.]" *Id.* As we explained in *Green*:

> [W]e will reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it "directly proves" the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of "*other* crimes, wrongs, or acts." If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." But all else must be analyzed under Rule 404(b).

617 F.3d at 248–49 (internal citations omitted).

Because the Government's use of Cammarata's tax returns fits neatly into the first category of intrinsic evidence, such use was not governed by Rule 404(b). To prove wire fraud, the Government had to show that the defendant "'willful[ly] participat[ed] in a scheme or artifice to defraud,' with intent to defraud[.]" *United States v. James*, 955 F.3d 336, 342 (3d Cir. 2020) (quoting *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012)). Juries may infer a defendant's intent

27

to defraud from circumstantial evidence. *United States v. Riley*, 621 F.3d 312, 333 (3d Cir. 2010).

The failure by Cammarata to report the transfers of settlement funds from Alpha Plus to PB Trade as income on his tax returns supported a reasonable inference that he knew the funds were unlawfully obtained and that he was attempting to conceal income derived from his fraudulent scheme. Such an inference would bear on his intent to defraud and thereby constitute circumstantial evidence offered to prove an element of wire fraud.[19] Because the testimony admitted here was intrinsic to a charged offense, Cammarata's Rule 404(b) challenge must fail. *See United States v. Ryan*, 213 F.3d 347, 350–51 (7th Cir. 2000) (explaining that evidence of a defendant's effort to conceal his participation in a fraudulent scheme by failing to report fraudulent transactions as income on his tax returns "constituted circumstantial evidence of intent to defraud" and was therefore not governed by Rule 404(b)) (internal quotation marks and citation omitted).

### b. Rule 403

We likewise reject Cammarata's Rule 403 challenge.[20] The probative value of Cammarata's failure to report the

---

[19] Indeed, Cammarata concedes that "the failure to declare income on a return may conceivably indicate consciousness of guilt with respect to the manner in which the income was earned[.]" Opening Br. at 33.

[20] Because Cammarata never objected to the discussion of his tax returns on Rule 403 grounds before the District Court, it

28

income he obtained from class action settlement funds on his tax returns was twofold. First, as discussed above, the evidence tended to prove Cammarata's fraudulent intent and knowledge by giving rise to a reasonable inference of his knowledge that receipt of the income was illegal. *See Williams*, 974 F.3d at 357 ("The fact that the evidence is intrinsic establishes its probative nature[.]"). Second, the evidence rebutted Cammarata's assertion that the settlement money derived from Nimello and Quartis's claims was rightfully obtained. Just before the prosecutor turned to Cammarata's tax returns, Cammarata stated he had received millions of dollars "for trade data that [he] owned and supported through claims." App. 1737. Pointing out that Cammarata had failed to report allegedly legitimate income on his tax returns tended to discredit his defense. *See, e.g.*, *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) (reasoning that the defendant's tax returns listing no income "were obviously probative to refute" the "defense that the contested funds were legitimate"); *see also Ryan*, 213 F.3d at 351.

Further, any risk of unfair prejudice posed by cross-examining Cammarata on his tax returns was minimal, at best. Cammarata argues that the Government unfairly portrayed him as a tax "cheat."[21] Opening Br. at 37. That, he now claims,

---

(understandably) did not conduct a Rule 403 balancing analysis. We undertake that analysis here.

[21] To be clear, prosecutors at no point during trial referred to Cammarata as a "tax cheat[,]" nor did they make reference to

biased the jury against him and tainted its verdict. Intrinsic evidence "that reveals a defendant's legal guilt can be highly prejudicial, but that alone does not make it unfairly so." *Long*, 92 F.4th at 488. What is proscribed is *unfair* prejudice, because it "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground *different* from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (emphasis added). The tax return evidence supported an element of the charged offense of wire fraud, so it was highly probative. Viewing the trial record as a whole, it was not outweighed by any risk of unfair prejudice.

Nor are we persuaded by Cammarata's contention that the probative value of the Government's cross-examination as to his tax returns was substantially outweighed by the risk of confusing the issues or misleading the jury. He argues that the propriety of omitting income on a Schedule C is a complex question the jury could not have properly evaluated without accompanying explanatory or expert evidence.

Our review satisfies us that the Government's cross-examination relative to the Schedule C submissions was limited and its purpose clear. The Government proffered Cammarata's tax returns only after he claimed he had offsetting losses that justified his failure to report income transferred from Alpha Plus to PB Trade. The prosecutor elicited responses from Cammarata which showed that Cammarata knew the purpose of a Schedule C submission

---

any of his tax returns during the Government's closing argument.

before highlighting that the tax returns listed no income for PB Trade but did list expenses. And the prosecutor repeatedly asked Cammarata whether he had informed the accountant who prepared his tax returns about the money he transferred from Alpha Plus, *i.e.*, the money he fraudulently obtained from settlement funds.

The Government's purpose in pursuing this line of questioning was plain: the relevancy of the omissions on Cammarata's tax returns was their tendency to prove efforts to conceal his fraudulent scheme, not that he was trying to avoid paying taxes. *See* Fed. R. Evid. 401(a) (providing that evidence is relevant if "it has any tendency to make a fact" of consequence in determining the action "more or less probable than it would be without the evidence").[22] Even if some risk of confusing the issues or misleading the jury existed, that risk did not substantially outweigh the probative value of the intrinsic evidence. *See Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992) (reasoning that excluding evidence under Rule 403 based on confusing the issues or misleading the jury would not have been justified where the testimony "tended to prove" a fact "directly at issue" in the case).

---

[22] As noted, the only ground specifically raised by trial counsel for exclusion of testimony concerning the tax returns was relevancy. Cammarata argues before us that the District Court should have sustained that objection. Our conclusions reached during plain error review amply foreclose that argument.

31

### C. Loss Calculation

Cammarata challenges the District Court's loss calculation under the Sentencing Guidelines.[23] Again, his challenge is meritless.

The Government bears the burden of establishing the amount of loss by a preponderance of the evidence. *Free*, 839 F.3d at 319. Although the Guidelines themselves define loss broadly as "the greater of actual loss or intended loss[,]" U.S.S.G. § 2B1.1, app. n.3(A), this Court has held that loss under the Guidelines is limited to "the loss the victim[s] actually suffered[,]" *United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, app. n.3(A)(i). "Reasonably foreseeable" means "pecuniary harm that the defendant knew, or . . . reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1, app. n.3(A)(iv). In arriving at "a reasonable estimate of the loss," a district court looks to all "available information in the record[.]" *United States v. Shah*, 43 F.4th 356, 366 n.12 (3d Cir. 2022) (citation omitted).

At sentencing, the District Court found that the Government had proven $40,862,748.30 in actual loss to class

---

[23] We review a district court's factual findings supporting its loss calculation for clear error. *United States v. Free*, 839 F.3d 308, 319 (3d Cir. 2016). We exercise plenary review over a district court's interpretation of the Guidelines, including what constitutes loss. *United States v. Shulick*, 994 F.3d 123, 145 (3d Cir. 2021).

members. That dollar figure represented the total amount of settlement funds that claims administrators had paid the Defendants for the fraudulent claims they had submitted. Importantly, the District Court found that the trial evidence proved "the claims administrator[s] had less money to pay actual legitimate claims because of the Defendant[s'] fraudulent submissions." App. 2090. Because the loss was between $25 and $65 million, Cammarata's offense level was increased by 22 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

Cammarata argues that the District Court's finding lacks evidentiary support. In his view, the Government failed to present evidence at trial that any particular class member was underpaid due to the Defendants' fraud. And he claims the District Court misapplied the Guidelines when it concluded that the over-$40 million fraudulent gain it found resulted in an equivalent "actual loss" to class members.

The District Court's factual finding informing its loss calculation was firmly rooted in the trial testimony. *See Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) ("A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed.") (internal quotation marks and citation omitted). Four claims administrators testified to the role they play, post-settlement, and also explained how the distribution process is supposed to unfold. In the ordinary course, a class member who submits a claim that is approved receives a *pro rata* share of the settlement fund based on a court-approved plan of allocation. As one administrator put it, the "settlement fund is divided" among all class members based on a "prorated

33

percentage" of their "loss[es.]" App. 1483.[24] And, as Cammarata concedes, it "can be readily seen" from the trial testimony that the amount a class member receives from a

[24] At trial, the Government introduced the Settlement Notice for *In re EndoChoice Holdings Securities Litigation*, a class action litigated in Georgia state court that ultimately settled and to which Alpha Plus submitted claims. The Government used the EndoChoice Settlement Notice as an exhibit during its examination of a claims administrator who was describing the settlement process. That Notice further illustrates how the settlement process works. Once notified of a proposed settlement, class members are required to submit a valid claim form within a specific time period. If they fail to do so, they are "forever barred from receiving any distribution" from the settlement fund. App. 1980. Class members may also choose to opt out of the class, if it is a Rule 23(b)(3) class, or they may object to the settlement. States oftentimes have state-law analogues to Rule 23(b)(3), such as Georgia's O.C.G.A. § 9-11-23(b)(3). From there, the court overseeing settlement holds a hearing and decides whether to approve the settlement. If the settlement is approved, the claims administrator determines how much each qualified clamant is entitled to receive. Payments are "calculated on a pro rata basis, meaning" the settlement fund is "divided among" class members who submitted valid claims. App. 1979. Afterwards, Class Counsel seeks permission from the court to distribute the settlement fund. If the court approves distribution, the settlement funds are then distributed according to the claims administrator's calculations.

settlement fund "depend[s] on the number of claims submitted to the administrator[.]" Reply Br. at 9.

The mathematical principle underlying the calculation of settlement claims is eminently straightforward. So is the impact that fraudulent claims will have on the amount available for payment to legitimate class members. As one claims administrator-witness stated, "if there are more claimants," everyone "get[s] less money." App. 1253. And as another claims administrator who testified put it, the payout of a fraudulent claim "lowers the amount of money that is available" to other, legitimate class members. App. 546; *see also* App. 659, 1253. The effect of fraudulent claims on the class as a whole could hardly be simpler.

Against this backdrop, the District Court appropriately concluded that the legitimate class members "actually suffered" a loss under the Guidelines. *Banks*, 55 F.4th at 258. As a result of Defendants' $40,862,748.30 in fraudulent claims, each legitimate class member's *pro rata* share of the settlement fund was proportionally reduced. And the fraudulent claims created administrative headaches. As one claims administrator explained, because fraudulent claims create "issues with the amount that was paid" to class members, once a fraudulent claim is discovered, claims administrators must "recalculate" the payment amounts to "provide losses . . . back to the original claimants who were wronged." App. 661.

We hold that under these circumstances, where the trial testimony showed that the Defendants' fraudulent scheme directly reduced the balance available from every settlement

35

fund for payment to legitimate class claimants, the District Court properly concluded that a "reasonably foreseeable pecuniary harm . . . resulted from the offense." U.S.S.G. § 2B1.1, app. n.3(A)(i) (defining "actual loss"). The District Court's $40,862,748.30 actual loss determination was consistent with the Guidelines.

### D. Restitution

The Mandatory Victims Restitution Act of 1996 ("MVRA") provides that restitution must be awarded to the victims of certain offenses, including offenses "against property" and "offenses committed by fraud or deceit[.]" 18 U.S.C. § 3663A(c)(1)(A)(ii). Cammarata does not dispute that the MVRA is applicable to his wire fraud and money laundering convictions.

At sentencing, the District Court adopted the Government's proposed restitution plan, invoking the MVRA and ordering that restitution be paid jointly and severally by the Defendants. The restitution order included an attachment, which identified: (1) over one hundred settlement funds as the payees; (2) the amounts the Defendants fraudulently obtained from each fund; and (3) the names of the claims administrators overseeing those funds that were to be distributed to the members of the defrauded classes.

Although the District Court attributed a $40 million plus loss to the class members defrauded by the Defendants' scheme, the amount of restitution it ultimately ordered was only $31,275,832.92. In doing so, the District Court acceded to the Government's requested amount. The Government's rationale for seeking restitution in an amount less than the total

36

loss was that "it may not be economically feasible for some of the [settlement] funds to distribute restitution payments to their ultimate beneficiaries." App. 375; *see also* App. 2148 (District Court adopting the Government's rationale at sentencing).

Cammarata attacks the District Court's restitution order on two grounds.[25]  First, he claims restitution was not directed to the "victims" of his offenses as that term is defined by the MVRA. Second, he argues that the District Court improperly relied upon claims administrators to distribute restitution funds. We reject both arguments. We conclude that the District Court abused its discretion by ordering restitution in an amount that did not fully compensate the victims. But because the Government did not cross-appeal, Supreme Court precedent requires us to affirm the District Court's restitution order.

### 1. The Defrauded Classes as Victims Under the MVRA

At various times throughout Cammarata's sentencing, the District Court characterized not only the class members as "victims" of the Defendants' fraud but also the settlement funds—and the claims administrators, as well. *See, e.g.*, App. 2067, 2073, 2078. 2148. Ultimately, in its restitution order, the District Court directed that restitution be paid to the settlement funds. Cammarata claims that none of these groups, and in particular the settlement funds, qualify as a "victim" under the MVRA.

---

[25] "We review the legality of a restitution order de novo and review specific awards for abuse of discretion." *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013).

This presents us with a legal question that our Court has not previously been called upon to resolve. Who qualifies as a victim under the MVRA when a defendant has defrauded hundreds of certified classes, resulting ultimately in individual harm to an even greater multitude of class members?

A crucial component of our analysis rests upon what seems a basic question: "just what a class *is* in a class action." ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION: CASES & MATERIALS 4 (4th ed. 2017) (emphasis in original). As Professor Klonoff queried: is "a class simply a convenient way to refer to a collection of individuals? Or is a class an entity unto itself—analogous perhaps to a corporation or unincorporated association—that has legal status apart from its individual members?" *Id.*

The Supreme Court and our Court have made clear that the latter is true. When a class is certified by the presiding district court judge, the "class of unnamed persons described in the certification acquire[s]" its own "legal status[.]" *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 753 (1976) (internal quotation marks and citation omitted). In other words, the "relevant entity for purposes of the litigation after certification is the class, not the individuals who make up the class." *Fisher v. Fed. Express Corp.*, 42 F.4th 366, 374 (3d Cir. 2022).

Indeed, members are not "plaintiffs," nor are they denominated as such. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 307 (3d Cir. 1998) (distinguishing between "the named plaintiffs" and "absentee class members"). A quick glance at the caption of a putative

38

class action complaint immediately notifies a reader that the pleading is not initiating a simple A vs. B lawsuit.[26]

Class actions are representative actions, *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 364 (3d Cir. 2015), and that term has profound implications for how this "ingenious procedural innovation" is litigated, *Eubank*, 753 F.3d at 719. Once a class has been certified,[27] its members effectively lose nearly all of their litigative individuality. Counsel for the class takes over (as do the class representative or representatives). And their roles vis-à-vis the class and its members impose upon them fiduciary duties. *See In re Fine Paper Litig.*, 632

---

[26] For example, the caption of the EndoChoice Holdings securities class action, to which Alpha Plus submitted claims after settlement was reached, was *In re EndoChoice Holdings, Inc. Securities Litig.*

[27] "As a practical matter, the certification decision is typically a game-changer, often the whole ballgame[.]" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 n.2 (3d Cir. 2012); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001) ("[D]enying or granting class certification is often the defining moment in class actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle nonmeritorious claims on the part of defendants)[.]").

F.2d 1081, 1086 (3d Cir. 1980); *Greenfield v. Villager Indus.*, 483 F.2d 824, 832 (3d Cir. 1973).[28]

These bedrock principles of class action jurisprudence inform the inquiry we now undertake. Because a class assumes an "independent legal status" once it has been certified, we must consider here whether the *classes* entitled to the settlement funds qualify as MVRA victims and are thereby initially affected by the Defendants' fraud. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013). We turn, then, to whether the classes, settlement funds, or claims administrators satisfy the MVRA's definition of victim.

The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered[.]" 18 U.S.C. § 3663A(a)(2). For scheme-based crimes such as wire fraud, that definition is broadened to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme[.]" *Id.* Though the MVRA's definition of victim uses the word "person[,]" our Court and other circuits have held that entities may qualify as victims under the MVRA. *See United States v. Bryant*, 655 F.3d 232, 253 (3d Cir. 2011) (hospital receiving federal funding); *United States v. Richardson*, 67

---

[28] Courts have imposed—even on the district court judge who approves a settlement—a fiduciary duty to the class. *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010) ("[T]he District Court evaluates the [settlement] agreement as a fiduciary for absent class members."); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002).

40

F.4th 268, 271 (5th Cir. 2023) (corporation); *United States v. Donaby*, 349 F.3d 1046, 1054 (7th Cir. 2003) (police department).

We agree with Cammarata's contention that the District Court incorrectly characterized both the settlement funds themselves and the claims administrators as "victims" under the MVRA. That both the "settlement funds" and the "claims administrators," in a cause-and-effect sense, were affected by the Defendants' fraud—albeit, in profoundly different ways—is indisputable. But the effects experienced by each hardly rendered them "victims" as that statutory term of art is intended under the MVRA. A "fund" is merely "a sum of money[,]" *Fund*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003), which is what we understand each of the settlement funds proffered here to be.[29] By itself, such a fund bears none

---

[29] The Fifth Circuit, in *United States v. Arledge*, 553 F.3d 881, 899 (5th Cir. 2008), categorized a settlement fund to which the defendant submitted fraudulent claims as a victim under the MVRA. In that case, however, the defendant did "not dispute that a restitution order was permitted by law;" he only contested the amount of restitution ordered and the schedule of repayment. *Id.* at 897. So the Fifth Circuit was not presented with a disputed issue as to whether the district court's conclusion that the settlement fund qualified as a victim under the MVRA was correct. Here, by contrast, Cammarata directly challenges the District Court's determination of the MVRA victim. Nothing in the *Arledge* opinion changes our conclusion that the settlement funds in this case do not qualify as victims under the MVRA.

41

of the incidents of the corporal or the corporate; it is neither a person nor a business entity. And the claims administrators retained in the underlying class actions are the antithesis of "victims." Their job was "the process of processing, reviewing and verifying the validity of all Claim Forms received." App. 1980. While the Defendants' fraudulent actions surely caused them inconvenience, they have made no claim for monetary loss. And, importantly, they were compensated for the tasks they performed.

By contrast, the defrauded classes easily meet the MVRA's definition of "victim." The losses that were suffered as a result of the Defendants' fraudulent scheme were experienced directly by the classes as they were defined in the nearly four hundred class actions that were targets of illegitimate claims. Accordingly, under the unique facts of this case as the Government developed them at trial, the victims of the Defendants' fraud were the *classes* entitled to settlement funds. *See Fischer v. Fed. Express Corp.*, 42 F.4th 366, 374 (3d Cir. 2022). But for the Defendants' fraudulent claims, the class settlement funds would have maintained larger balances which would then have been distributed to members with valid claims. Accordingly, the Defendants "directly and proximately harmed" the classes by reducing the amount of settlement funds that class members would ultimately receive. 18 U.S.C. § 3663A(a)(2).

Because we conclude that the defrauded classes were the victims, Cammarata is wrong when he contends that the District Court ran afoul of the MVRA by declining to identify each class member in its restitution order. *See United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir. 2001) (holding that a district

42

court did not abuse its discretion by declining to identify the individual members comprising the "unified entity" to which restitution was ordered).

The District Court did not list the defrauded classes as the entities to which restitution was to be paid in its restitution order; it instead listed the settlement funds. But considering the District Court's restitution plan, we disagree with Cammarata's contention that this lack of precision means that restitution "was not directed" to the victims of his crimes such that the restitution order must be reversed. Opening Br. at 46.

The District Court viewed the defrauded class members as the "true victims" under the MVRA. Reply Br. at 11 (internal quotation marks omitted). And the District Court's restitution plan made clear that the class members, not the settlement funds or claims administrators, were the ultimate recipients of restitution. While restitution would be initially paid to the settlement funds, the District Court expected the claims administrators associated with those funds to "distribute restitution . . . payments to their ultimate beneficiar[ies]"—the members of the defrauded classes. App. 2148. Thus, in ordering restitution, the District Court effectively directed restitution in a manner that assured it would ultimately be paid out to the members of the victim classes.

And given the appropriate focus of the District Court's restitution plan, we decline to reverse the District Court's

43

restitution order simply because it listed the settlement funds as the payees.[30]

### 2. The District Court Did Not Err By Relying On Claims Administrators to Distribute Restitution Funds

Cammarata further argues that the District Court improperly "delegate[d]" the task of distributing restitution. Opening Br. at 45. Cammarata essentially complains that the District Court relied upon the claims administrators initially responsible for distributing settlement funds to class members to also distribute monies recovered pursuant to the MVRA to those same class members. In his view, instead of engaging in this "creative circumvention of the governing" statute, the District Court should have foregone restitution entirely because distributing it would have been impracticable and/or excessively burdensome. *Id.* We disagree. Given the unusual circumstances of this case, we conclude that the District Court's approach complied with the MVRA.

As discussed, the District Court's restitution plan sought to effectuate the MVRA's purpose of "compensat[ing] the victim[s] for [their] losses and, to the extent possible, . . . mak[ing] the victim[s] whole." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001). The District Court directed the

---

[30] We stress, however, that when faced with similarly complex facts that require intricate restitution schemes, a district court should be careful to explicitly identify victims and accurately outline its plan for distributing restitution to those victims in its restitution order.

44

Defendants to return the money they fraudulently obtained from settlement funds so the claims administrators overseeing those funds could distribute individualized payments to affected class members. Courts have affirmed more attenuated approaches to providing restitution to victims under the MVRA.

In *United States v. Gee*, 432 F.3d 713 (7th Cir. 2005), the defendant pleaded guilty to conspiring to defraud the United States, in violation of 18 U.S.C. § 371. *Id.* at 714. Although the Seventh Circuit recognized that the MVRA "victim" in an 18 U.S.C. § 371 prosecution was actually the United States, it nonetheless affirmed the terms of the district court's restitution order directing that a nonprofit organization was ultimately entitled to receive $200,000. *Id.* at 715. It reasoned that the organization was "a proxy for the federal interest because it was a recipient of federal funds[.]" *Id.*

We endorsed a similar approach in *Bryant*, 655 F.3d at 253–54. In that case, the defendants were convicted of honest services fraud[31] and mail fraud pursuant to 18 U.S.C. §§ 666(a), 1341, 1343, and 1346. *Id.* at 236. The defendants' fraudulent scheme involved a *quid pro quo* exchange that financially harmed a university. *Id.* at 237, 253.[32] We affirmed

---

[31] As we explained in *Bryant*, honest services fraud "is fraud that results in a loss to the public of its right to the honest services of its public servants[.]" 655 F.3d at 254.

[32] More specifically, one defendant gave the other a "low-show" job—"meaning he provided only minimal or nominal services"—at the university's school of osteopathic medicine.

45

the district court's restitution order directing payment to the university. *Id.* at 253. Unlike the settlement funds in the case before us, we held that the university itself qualified as a victim under the MVRA. *Id.* Still, we recognized the "intangible losses" to the public caused by the defendants' honest services fraud. *Id.* at 254. We explained that the university being awarded restitution was "a proxy for the State's interests, including its citizens' interest in the honest services of its public servants[,]" because it was a recipient of taxpayer funds. *Id.* Providing restitution to the university, we reasoned, "indirectly compensate[d] the public for its loss[es.]" *Id.*

Here, the settlement funds and the claims administrators listed in the District Court's restitution order did not serve as did the "proxies" in either *Gee* or *Bryant*. Neither the funds nor the administrators were paid restitution for their own benefit with the understanding that such payments would "indirectly compensate[]" victims of the Defendants' fraud. *Id.* Instead, the funds were the repositories for monies to which the classes were entitled, and the claims administrators were tasked with simply fulfilling the roles they had been given to administer the class action settlements pursuant to a process envisioned by Federal Rule of Civil Procedure 23 and as directed by the settlement agreements that had received court approval.

---

*Bryant*, 655 F.3d at 237. In exchange, the defendant who obtained the job leveraged his position as a New Jersey State Senator to funnel state funding to the school. *Id.* The scheme diverted over $2 million from the university's budget for direct allocation to the school of osteopathic medicine. *Id.* at 253.

46

Relying upon an entity with the means and expertise required to distribute restitution under circumstances similar to those presented in this case is not only appropriate but well-advised. Consider *Herzfeld v. United States District Court*, 699 F.2d 503, 507 (10th Cir. 1983), in which the Tenth Circuit upheld the creation of a receivership to distribute restitution. The defendant in that case had engaged in a widespread fraudulent scheme that had harmed numerous investors. *Id.* at 504. The Tenth Circuit explained that "[i]n a scheme like this one, where substantial sums of money are involved, the appointment of a receiver to . . . distribute the money is both necessary and beneficial to accomplish restitution." *Id.* at 506. It reasoned that the "usual practice of directing a probation officer to accomplish restitution is desirable where there are few claimants and where the amount of money is not great." *Id.* But where "the number of claimants is large and a pro rata distribution of a large fund is necessary," the court concluded that "a person with more specialized training is required." *Id.*

Like the receivership in *Herzfeld*, the "functions to be performed" in distributing restitution to the victim classes in the case before us "are typically those of a" claims administrator. *Id.* at 506. The Presentence Investigation Report explained that restitution funds would be distributed to the victim classes by the claims administrators, "given their familiarity and expertise in making distributions." PSR ¶ 54. The District Court's restitution order went only so far as listing the amounts the Defendants owed to the victim classes. Determining the amount of restitution to which each class member is entitled to receive the entirety of their *pro rata* share of the settlement fund, and then distributing those funds, should be within the province of claims administrators. Indeed,

47

as one claims administrator testified at trial: when a fraudulent claim is discovered, the claims administrator must "recalculate" the amount distributed to class members to "provide losses . . . to the original claimants who were wronged." App. 661. To achieve the MVRA's purpose of making victims whole, the District Court correctly relied upon claims administrators to perform their core function—distributing settlement funds to class members on a *pro rata* basis.

Given both the facts and complexity of this case, as well as the procedural posture of the numerous class actions, it was not up to the District Court to fashion a restitution order and also assume the function of a settlement administrator.

Finally, we reject Cammarata's assertion that the District Court, instead of relying on claims administrators to distribute restitution funds, should have foregone restitution under 18 U.S.C. § 3663A(c)(3). That provision provides that mandatory restitution "shall not apply" where: (1) "the number of identifiable victims is so large as to make restitution impracticable; or" (2) "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." *Id.* § 3663A(c)(3)(A)–(B).

Whether to forego restitution under § 3663A(c)(3) is within "the exercise of" the District Court's "sound discretion[.]" *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012). And "[d]eference to the district court's consideration of

48

the issue is . . . typically warranted if 'the record indicates that the district court, although aware of the difficulties involved in ordering restitution[,] . . . considered restitution an essential part of [the defendant's] sentence." *United States v. Gushlak*, 728 F.3d 184, 193 (2d Cir. 2013) (quoting *United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003)).

Here, the District Court invoked § 3663A(c)(3) and properly explained that under that provision, it must "weigh . . . the burden [of] awarding restitution" against the victims' "interest in receiving restitution." App. 2147; *see Gushlak*, 728 F.3d at 192. The Court acknowledged potential difficulties in distributing restitution, but as to the $31,275,832.92 in restitution it ultimately ordered,[33] the Court reasoned that such difficulties did not render distribution in that amount infeasible or unduly burdensome. And as just explained, the District Court did not err in relying on claims administrators to distribute that restitution. Moreover, the record shows that the Court regarded restitution as an essential component of Cammarata's sentence. *See Catoggio*, 326 F.3d at 328; App. 2146 ("[L]et me put on the record the need to provide

---

[33] As we explain next, the District Court abused its discretion by awarding restitution in this amount, as it did not fully compensate the victims' losses. But because the Government did not cross-appeal, that abuse of discretion cannot justify vacatur and remand for recalculation. So with the restitution award effectively capped at the $31 million figure, we consider whether the District Court abused its discretion by not foregoing restitution in that amount, *i.e.*, the amount it actually ordered.

49

restitution."). Because this determination "requires a detailed understanding of and sensitivity to the facts of each case[,]" *Gushlack*, 728 F.3d at 193, we defer to the Court's analysis and conclude that it did not abuse its discretion by not foregoing restitution under § 3663A(c)(3), *cf. United States v. Malone*, 747 F.3d 481, 487 (7th Cir. 2014) (perceiving no abuse of discretion where "although [the district court] did not expressly explain [its] balancing of the relevant complexity exception factors, [it] clearly considered those factors and exercised [its] discretion not to apply the exception in this case").

### 3. Although the District Court Abused Its Discretion by Failing to Award Full Restitution to Each Victim Class, We Will Not Disturb Its Restitution Order

Having rejected Cammarata's arguments with respect to the MVRA victims and the District Court's approach to distributing restitution, we turn to the amount of restitution ordered, *i.e.*, the Court's decision to order only $31 million in restitution after finding a more than $40 million loss.[34] In doing

---

[34] In a now vacated opinion, we observed that although Cammarata's argument was less than clear to us, he seemed to be pointing to the $9 million reduction from loss found to restitution ordered as a reason the District Court ran afoul of the MVRA. *See* Opening Br. at 45 (highlighting the "adjustment" and contending that "[t]he [restitution] award thus lacked any credible evidentiary basis and bears no rational relationship to its articulated rationale") (internal quotation marks omitted). We agreed, vacated the restitution order, and remanded with instructions to the District Court to either

50

so, the Court ran afoul of the MVRA. Nevertheless, because the Government did not cross-appeal, and in fact requested restitution in that underinclusive amount, we will affirm the District Court's restitution order.

The MVRA contemplates that ordering restitution is an all-or-nothing approach. A district court must "order restitution to *each* victim in the *full* amount of each victim's losses[.]" 18 U.S.C. § 3664(f)(1)(A) (emphasis added). "Thus, there is no restitution range under . . . § 3664(f)(1)(A) that starts at zero and ends at the full amount of each victim's losses; rather, the single restitution amount triggered by the conviction under the MVRA . . . is the full amount of loss." *United States v. Leahy*, 438 F.3d 328, 337–38 (3d Cir. 2006) (internal quotation marks omitted); *see also id.* at 337 ("[W]hen the court determines the amount of loss, it is merely giving definite shape to the restitution penalty born out of the conviction.").

Here, the District Court ordered restitution to only 115 of the 397 classes victimized by the Defendants' fraudulent

---

forego restitution entirely under 18 U.S.C. § 3663A(c)(3) or adjust the restitution award to fully compensate the victims' losses. Cammarata petitioned for panel rehearing. He clarified that he had not challenged the $9 million reduction as a basis for reversing the restitution order as underinclusive. He also raised, for the first time, the Supreme Court's decision in *Greenlaw v. United States*, 554 U.S. 237 (2008). We granted panel rehearing on this basis, and we address *Greenlaw*'s import below.

51

scheme.[35] And the amount awarded to those 115 classes fell well below the over-$40 million loss suffered by all the victim classes. By ordering less-than-full restitution, the District Court abused its discretion. *See United States v. Alalade*, 204 F.3d 536, 540–41 (4th Cir. 2000) (holding that the MVRA does not vest district courts with discretion to reduce the amount of restitution below the full amount of each victim's losses).

We previously concluded that this abuse of discretion required us to vacate the restitution order and remand for the Court to reconsider its restitution award consistent with the requirements of the MVRA. Now, with the benefit of briefing at the panel rehearing stage, we conclude that the Supreme Court's decision in *Greenlaw v. United States*, 554 U.S. 237 (2008), precludes such a remedy in this case.

*Greenlaw* provides that under the "cross-appeal rule," an "appellate court may not alter a judgment to benefit a nonappealing party." *Id.* at 244. In that case, the defendant appealed his sentence, claiming it was excessive, and the government did not cross appeal. *Id.* at 242. The Eighth Circuit, after rejecting the defendant's arguments, vacated the

---

[35] The list of 115 settlement funds was provided by the Government and incorporated into the District Court's restitution order. The Government apparently determined "for each fund a threshold amount of recovery below which it would not be feasible to make further distribution." App. 2148. The list of funds in the restitution order excluded the settlement funds from which the Defendants fraudulently obtained amounts less than the Government's unidentified threshold.

defendant's sentence and remanded for the district court to increase the sentence by 15 years to accord with the applicable statutory mandatory minimum. *Id.* at 242–43. The Supreme Court reversed. It held that "absent a Government appeal or cross-appeal, the sentence [the defendant] received should not have been increased." *Id.* at 240. That same principle controls here, and without a cross-appeal from the Government, it prevents us from remanding to the District Court for further proceedings that might enlarge Cammarata's restitution obligation.

*Greenlaw* dealt with an increase to a defendant's term of imprisonment, not as here, a restitution award under the MVRA. But we have little trouble concluding that *Greenlaw* applies in this context. After all, MVRA restitution is "a form of criminal penalty" that is "imposed as an integral and necessary part of sentencing[.]" *United States v. Edwards*, 162 F.3d 87, 91 (3d Cir. 1998). *Greenlaw*'s mandate that "the sentence [a defendant] received should not" be increased without a government cross-appeal, therefore, necessarily encompasses restitution under the MVRA. *Greenlaw*, 554 U.S. at 240.

Accordingly, and although the District Court abused its discretion by failing to fully compensate the victims of Cammarata's offenses, the Government's failure to cross-appeal requires that we affirm the District Court's restitution order. *See United States v. Greenlaw*, 538 F.3d 830, 831 (8th Cir. 2008) (affirming the defendant's sentence on remand); *In re Amy Unknown*, 701 F.3d 749, 774 (5th Cir. 2012) (en banc), vacated and remanded sub nom. *Paroline v. United States*, 572 U.S. 434 (2014), and cert. granted, judgment vacated sub nom.

53

*Wright v. United States*, 572 U.S. 1083 (2014) (affirming a similarly underinclusive restitution award under *Greenlaw* in the absence of a government cross-appeal).

### E. Forfeiture

Finally, Cammarata claims the forfeiture of his vacation home (the "Poconos property") violated Federal Rule of Criminal Procedure 32.2. Whether forfeiture of the Poconos property complied with Rule 32.2 is a question of law over which we exercise plenary review. *See United States v. 6109 Grubb Rd.*, 886 F.2d 618, 621 (3d Cir. 1989).

The superseding indictment included a forfeiture allegation pursuant to 28 U.S.C. § 2461(c)[36] and 18 U.S.C. § 981(a)(1)(C),[37] directing the Defendants to forfeit "any property, real or personal, that constitutes or is derived from

---

[36] Section 2461(c) provides that if a defendant is convicted of an offense for which criminal forfeiture is authorized, the district court "shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure[.]" 28 U.S.C. § 2461(c). "The federal rule referenced in § 2461(c) is Rule 32.2[.]" *United States v. Lo*, 839 F.3d 777, 790 (9th Cir. 2016).

[37] Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" certain offenses, including mail and wire fraud, "is subject to forfeiture to the United States[.]" 18 U.S.C. § 981(a)(1)(C) (incorporating 18 U.S.C. §§ 1956(c)(7) and 1961(1)).

54

proceeds traceable to the commission" of the charged wire fraud offenses, "including, but not limited to the sum of $40,000,000[.]" App. 116. The forfeiture allegation also stated that the Government intended to "seek forfeiture of any other property of the [D]efendants up to the value of the property subject to forfeiture" pursuant to 21 U.S.C. § 853(p). *Id.*

At the charge conference on the final day of trial, the District Court asked the Government whether the jury needed to consider any forfeiture issues, inquiring: "it's not a notice of forfeiture as to specific property, right?" App. 1802. In posing that query, the District Court complied with Rule 32.2(b)(5)(A), which requires a court to "determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A). Cammarata essentially concedes that the Court complied with the Rule. Because the Government advised that it was seeking a "money judgment only[,]" neither party requested that the jury address forfeiture. App. 1802.

Months after trial and a week before Cammarata's sentencing was to occur, the Government filed a motion for forfeiture, seeking both a money judgment and forfeiture of the Poconos property. The Government averred that the Poconos property was traceable to fraudulent proceeds and thus subject to forfeiture under § 981(a)(1)(C). To that end, it attached a declaration executed by a government investigator which traced Cammarata's purchase of the Poconos property to three payments Alpha Plus had fraudulently received from class action settlement funds.

55

At sentencing, Cammarata objected to forfeiture of the Poconos property, arguing that the Government failed to provide him with sufficient notice. Such failure, he claimed, deprived him of his right to have a jury determine the property's forfeitability. Rather than ruling on Cammarata's objections, the District Court determined that the Government had proved by a preponderance of the evidence that the Poconos property was traceable to fraudulent proceeds. And by an order issued on June 6, 2023, the Court directed Cammarata to forfeit both $16,493,939.73, the amount he personally gained through the fraudulent scheme, and the Poconos property itself.

Cammarata claims the District Court erred by ordering the Poconos property's forfeiture. He re-asserts his notice argument and contends that the Government waived its ability to seek the property's forfeiture when it represented at trial that it would seek only a money judgment. And he argues that he was deprived of the jury trial right afforded to him by Rule 32.2(b)(5)(A).

We reject Cammarata's notice and waiver arguments. We conclude, however, that ordering forfeiture of the Poconos property as traceable to fraudulent proceeds without affording Cammarata a right to the jury trial afforded by Rule 32.2(b)(5)(A) was error subject to harmless error review. While reversal is not warranted under that standard, remand is. On remand, the Government should move to amend the forfeiture order to reflect that the Poconos property is forfeitable as "other property" under 21 U.S.C. § 853(p), not as property derived from criminal proceeds under 18 U.S.C. § 981(a)(1)(C).

56

### 1. The Government Provided Adequate Notice

The general notice provided by the Government in the superseding indictment was sufficient under 28 U.S.C. § 2461(c) and Rule 32.2(a). Section 2461(c) states only that "the Government may include notice of forfeiture in the indictment . . . pursuant to the Federal Rules of Criminal Procedure." And Rule 32.2(a) requires the Government to provide notice in an indictment that it "will seek the forfeiture of property as part of any sentence[.]" Fed. R. Crim. P. 32.2(a); *Lo*, 839 F.3d at 790. Such notice "need not identify" the specific property or the amount of money subject to forfeiture. Fed. R. Crim. P. 32.2(a).

The superseding indictment made plain the Government's intention to seek the forfeiture of "any property, real or personal," as part of Cammarata's sentence. App. 116. Neither Rule 32.2(a) nor § 2461(c) required more. *See United States v. Lacerda*, 958 F.3d 196, 217 (3d Cir. 2020) (holding that nearly identical language in an indictment was sufficient under Rule 32.2).

### 2. The Government Did Not Waive Its Right to Seek Forfeiture of the Poconos Property

Cammarata further argues that the Government waived its right to seek forfeiture of the Poconos property when it represented during the charge conference that it was seeking only a money judgment. He claims the District Court committed reversible error when it nonetheless disregarded his objection at sentencing and ordered the property's forfeiture. The basic flaw in Cammarata's argument is that he did not

57

object on the ground that the Government had waived its right to seek forfeiture of specific property. App. 2071–73, 2089.

Accordingly, we review Cammarata's waiver argument for plain error. *See United States v. Watson*, 482 F.3d 269, 274 (3d Cir. 2007). We again recite that the plain error doctrine requires that "an appellant . . . show (1) a legal error (2) that is plain and (3) that has affected his substantial rights." *Dorsey*, 105 F.4th at 528 (citing *Olano*, 507 U.S. at 732). Only if these requirements are met, may we exercise our discretion to correct the error, and then only if allowing the error to stand would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotation marks and citations omitted).

Cammarata fails to cite a single case supporting his waiver argument. Though "lack of precedent alone" does not categorically "prevent us from finding plain error[,]" we will do so only if "absolutely clear legal norm[s]" compel that conclusion. *United States v. Jabateh*, 974 F.3d 281, 299 (3d Cir. 2020) (internal quotation marks and citations omitted). Cammarata cannot show that any error here meets such a demanding test.

Notably, the Government claims that it was not aware, even by the time trial concluded, that the Poconos property was forfeitable as traceable to fraudulent proceeds. While the Government suggests that its "forfeiture submissions should have clarified that its tracing had only occurred post-trial[,]" Response Br. at 60 n.8, that fact is apparent in the declaration underpinning the Government's forfeiture motion. The declaration, executed months after trial, explained that the

58

investigator-declarant concluded that the Poconos property was traceable to fraudulent proceeds only *after* reviewing trial testimony and exhibits.

Waiver requires the "'intentional relinquishment or abandonment of a known right.'" *Hamer v. Neighborhood Hous. Servs.*, 583 U.S. 17, 20 n.1 (2017) (quoting *Olano*, 507 U.S. at 733). We fail to see, then, how the Government could have waived any right to seek forfeiture of property the forfeitability of which it was unaware when it represented to the District Court that it would seek only a money judgment. *See Magouirk v. Warden*, 237 F.3d 549, 553 (5th Cir. 2001) (agreeing in a habeas proceeding that state prosecution did not waive its ability to later advance an argument it "did not know of" at the time of trial).

Moreover, forfeiture of property traceable to criminal proceeds is mandatory upon conviction, so long as the Government provides sufficient notice in the indictment. *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); *United States v. Hernandez*, 803 F.3d 1341, 1343 (11th Cir. 2015) (explaining that because forfeiture was authorized under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and "the government included notice of the forfeiture in [the defendant's] indictment, the district court was required by § 2461(c) to order forfeiture as part of his sentence").

As explained, the Government provided sufficient notice here. To conclude that it later waived its ability to seek the Poconos property's forfeiture during the charge conference would be contrary to the mandatory nature of criminal forfeiture and the facts of this case.

59

### 3. Deprivation of the Jury Right Afforded by Rule 32.2(b)(5)(A) Constituted Procedural Error That Merits Remand

Finally, Cammarata claims his inability to submit the issue of the Poconos property's forfeitability to the jury constituted a fundamental violation of Rule 32.2(b)(5)(A). In his view, this error requires us to reverse the District Court's forfeiture order as to the Poconos property.

Rule 32.2(b)(5)(A) is plainly directed at district courts, not litigants. It provides that "the court must determine" whether either party requests that the jury be retained to determine the forfeitability of specific property. Fed. R. Crim. P. 32.2(b)(5)(A). As Cammarata concedes, the District Court heeded the Rule's mandate when it inquired of the Government at the charge conference whether it was seeking forfeiture of specific property. So the District Court did not violate Rule 32.2(b)(5)(A). *See United States v. Fisher*, 943 F.3d 809, 814 (7th Cir. 2019) (explaining that Rule 32.2(b)(5)(A) "is violated when a judge does not determine if a party wants the jury to decide whether certain property is forfeitable"). Nor can we ascribe any intentional error to the Government when it provided sufficient notice in the superseding indictment. Rule 32.2(b)(5)(A) does not govern the Government's conduct. And even if it did, the record indicates that it was not aware until after the jury had rendered its verdict that it had a basis to seek forfeiture of the Poconos property.

That said, we cannot ignore that Cammarata was deprived of the jury right afforded to him by Rule

60

32.2(b)(5)(A). That deprivation of process constituted procedural error.

As both parties recognize, that procedural error is subject to harmless error review on appeal.[38] *See* Fed. R. Crim. P. 52(a). And it is the Government's burden to demonstrate that the error was harmless. *United States v. Titchell*, 261 F.3d 348, 354 (3d Cir. 2001). Because a violation of Rule 32.2(b)(5)(A) is not of constitutional dimension,[39] reversal is "not warranted

---

[38] The Supreme Court's recent decision in *McIntosh v. United States*, 601 U.S. 330 (2024), bolsters this conclusion. There, the Court held that Rule 32.2(b)(2)(B)—mandating the entry of a preliminary order of forfeiture prior to sentencing—is a "time-related directive that, if missed, does not deprive the judge of her power to order forfeiture against the defendant." *Id.* at 342. *McIntosh*'s reasoning compels the same conclusion here with respect to Rule 32.2(b)(5)(A). *See id.* at 341–44; *United States v. Williams*, 720 F.3d 674, 700–01 (8th Cir. 2013) (holding that Rule 32.2(b)(5)(A) is "merely a time-related directive deadline" that is "legally enforceable but does not deprive a judge . . . of the power to take the action to which the deadline applies if the deadline is missed") (internal quotation marks and citation omitted). Still, failure to abide by a time-related directive is "subject to harmless-error principles on appellate review[.]" *McIntosh*, 601 U.S. at 338.

[39] Cammarata's contention that a deprivation of Rule 32.2(b)(5)(A)'s jury right is "structural error" requiring automatic reversal lacks merit. As he appears to concede, Supreme Court precedent forecloses his argument. *See Libretti*

61

if it is 'highly probable that the error did not contribute to the judgment.'" *United States v. Browne*, 834 F.3d 403, 416 (3d Cir. 2016) (quoting *United States v. Brown*, 765 F.3d 278, 295 (3d Cir. 2014)).

The Government's harmlessness argument is that even if the jury had found that the Poconos property was not forfeitable, Cammarata would nonetheless have had to forfeit it as substitute property under 21 U.S.C. § 853(p). That provision allows the Government to seek forfeiture of "property untainted by the crime[,]" *i.e.* substitute property, so long as it can prove one of five conditions listed in § 853(p)(1). *Honeycutt v. United States*, 581 U.S. 443, 451 (2017). These conditions include when, "as a result of any act or omission of the defendant", forfeitable property has been "transferred or sold to, or deposited with, a third party"; "placed beyond the jurisdiction of the court"; or "commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(B), (C), (E).

We are mindful that the superseding indictment put Cammarata on notice of the Government's intention to seek forfeiture of substitute property under § 853(p). In the declaration supporting the Government's forfeiture motion, its

*v. United States*, 516 U.S. 29, 49 (1995) ("[T]he right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection."); Opening Br. at 49 & n.16 (acknowledging that "the 'structural error' rubric does not apply to a jury right conferred by statute rather than by the Constitution itself" and "[r]ecognizing that this Cou[r]t is bound by the precedent set in *Libretti*").

62

investigator concluded that "much of the" nearly $16.5 million in fraudulent proceeds Cammarata obtained had been transferred to a third party, used to pay for real property outside the United States, and/or commingled with other property. App. 330. In its forfeiture order, the District Court concluded that "one or more conditions in 21 U.S.C. § 853(p) have been met" and authorized the Government to seek forfeiture of substitute property. App. 16–17. And under Rule 32.2(e), upon the Government's motion, a district court "may at any time enter an order of forfeiture or amend an existing order of forfeiture to include" substitute property without the involvement of a jury. Fed. R. Crim. P. 32.2(e)(1), (3).

We acknowledge the practicality of the Government's harmlessness argument. Insofar as Cammarata would have forfeited the Poconos property as substitute property in any event, it is highly probable that the procedural error did not contribute to the judgment. So reversal is not warranted. *See Browne*, 834 F.3d at 416. But we decline the Government's invitation to affirm, without amendment to the forfeiture order, simply because Cammarata would have forfeited the Poconos property under a process distinct from the one it pursued before the District Court.

As we explained in *United States v. Voigt*, where "all that is at issue is the process by which the government may seize property in satisfaction of the" forfeiture amount to which it is legally entitled, the solution "is to give effect to the substitute asset provision." 89 F.3d 1050, 1088 (3d Cir. 1996). Accordingly, we will vacate the District Court's forfeiture order to the extent it reaches the Poconos property. And we will remand for the limited purpose of allowing the Government to

63

move to amend the forfeiture order under Rule 32.2(e) to reflect that the Poconos property is forfeitable as a substitute asset. *See id.* (remanding for a similar amendment of a forfeiture order where the district court erroneously concluded that specific property was forfeitable as traceable to criminal proceeds).

## III.    CONCLUSION

In sum, we will affirm Cammarata's conspiracy, wire fraud, and money laundering convictions, as well as the District Court's restitution order. We will vacate the forfeiture order in part and remand for further proceedings consistent with this opinion.